STATE OF NORTH CAROLINA
v.
FREDERICK L. WEAVER

No. COA13-578

Filed 17 December 2013

**Search and Seizure—reasonable suspicion—traffic stop—armed security guard—not state agent**

The trial court erred in a driving while impaired case by granting defendant's motion to suppress evidence. Certain challenged findings of fact were not supported by the evidence and the remaining findings did not support the trial court's conclusion that an armed security guard was an agent of the State. Accordingly, the security guard's traffic stop of defendant did not require reasonable suspicion.

Appeal by the State from order entered 27 March 2013 by Judge W. Allen Cobb, Jr. in New Hanover County Superior Court. Heard in the Court of Appeals 23 October 2013.

**STATE v. WEAVER**

[231 N.C. App. 473 (2013)]

*Attorney General Roy Cooper, by Assistant Attorney General
Teresa M. Postell, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate
Defender Constance E. Widenhouse, for defendant.*

Elmore, Judge.

On 20 April 2012, Frederick Lloyd Weaver, Jr. (defendant) was
arrested in New Hanover County and charged with driving while
impaired (DWI) and carrying a concealed weapon. He was found guilty
of DWI in New Hanover County District Court and appealed his convic-
tion to New Hanover County Superior Court. Defendant filed a pre-trial
motion to suppress, which was heard on 23 January 2013 and granted by
the trial court.

The State now appeals and raises as error the trial court's conclu-
sion that an armed security guard was an agent of the State. After care-
ful consideration, we reverse the trial court's order granting defendant's
motion to suppress and remand for further proceedings.

## I. Facts

Brett Hunter is a security guard employed by Metro Special Police
and Security Services, Inc. (Metro). Hunter is a licensed security officer
as defined by N.C. Gen. Stat. § 74C-3(a)(6) (2011). He is certified through
the Private Protective Services Board (PPSB). As required by the PSSB,
Hunter satisfied the basic required training, including a minimum of four
hours of class time and eight hours of range time for firearm certifica-
tion.[1] He is not trained in speed detection or in detection of impaired
drivers. On 20 April 2012, Hunter had been employed by Metro for two
years as a security officer. Although Metro employed an estimated 40
employees, some of whom were "special police officers," Hunter was
not a "special police officer." On the date of defendant's arrest, and as
part of his job responsibilities, Hunter wore a uniform, carried a firearm,
and worked as a patrol and standing officer. He also drove a patrol car
that had "Metro Public Safety" printed on the outside. The vehicle also
had overhead warning lights that were white, red, and amber in color.
The patrol car did not have a siren.

---

1. We initially note that that despite Hunter being licensed as a security guard by
the State and subject to training and certification requirements by the PPSB, Hunter is
not considered "[a]n officer or employee of . . . this State[.]" N.C. Gen. Stat. § 74C-3(b)
(2) (2011).

On 20 April 2012, Hunter was assigned to provide security services for Carleton Place, a town home community close to the campus of the University of North Carolina at Wilmington (UNCW). Although not a part of campus, Carleton Place is a college community with the usual concerns of any area close to a university: parties, underage drinking and possession of alcohol, vandalism, and failure to abide by community rules and regulations. As part of Metro's contract with Carleton Place, Hunter was authorized to issue civil citations and fines to anyone on the property who violated the rules and regulations of the community, such as exceeding the posted community speed limit. Unpaid civil fines would be sent to collections agencies for resolution.

At the suppression hearing, the only witnesses who testified were Hunter and Detective Michael Tenney of the Wilmington Police Department (WPD). Hunter testified that at approximately 2:10 A.M. on Friday, 20 April 2012, he observed a dark-colored Acura enter Carleton Place. Hunter testified that he saw the Acura through his rearview mirror as it crossed over the center street lines several times at a high rate of speed. Although cars were parked on both sides of the street, he reported seeing no other vehicles on the street. Hunter estimated the Acura to be travelling at 25 miles per hour (m.p.h.), 10 m.p.h. above the posted community speed limit. He believed this speed was unreasonable due to the rainy weather conditions. Hunter observed the Acura turn on a side street in the complex. At that time, Hunter activated his vehicle's warning lights and followed the Acura. The Acura pulled over to the side of the road and stopped.

Hunter testified that he approached the driver's window and observed defendant sitting in the driver's seat with no other occupants in the vehicle. Hunter introduced himself as "Officer Hunter from Metro Public Safety" and asked defendant if he had identification or a driver's license on him. Hunter testified that defendant was unresponsive and that he could "smell an odor of alcohol coming from the vehicle and [defendant's] person and also observed that his eyes were bloodshot." Hunter told defendant that he was stopped for "careless and reckless speeding." Hunter asked defendant if he had any "physical limitations or medical conditions that would . . . prevent [defendant] from understanding [his] questioning and also if [defendant] had any intoxicating substance that night." When defendant admitted that he had consumed alcohol at a local bar, Hunter then asked defendant to "step out of [the] vehicle and have a seat on the . . . sidewalk[.]" Hunter called city dispatch and asked them to "[s]end an officer out for possible DUI." Hunter issued

defendant a civil citation and testified that he did not give defendant any further instructions or carry on any additional conversation thereafter.

Five to ten minutes later, a UNCW police officer arrived. However, the officer realized that Carleton Place was outside her jurisdiction, so she called city dispatch back, requested that they send an officer from the WPD, and left the scene. At approximately 2:45 A.M., Detective Tenney arrived on the scene. Hunter told Detective Tenney about his observations of defendant's driving and physical condition. Thereafter, Detective Tenney saw defendant sitting on the curb. When Detective Tenney approached defendant, he testified that defendant "stood up," was "unsteady on his feet," had bloodshot eyes, and exhibited slurred speech. Detective Tenney then conducted several field sobriety tests, formed the opinion that defendant was appreciably impaired, and arrested defendant for DWI.

## II. Analysis

### a.) Findings of Fact

First on appeal, the State challenges several of the trial court's findings of fact and argues that the findings are not supported by competent evidence. We agree.

Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

Here, the trial court concluded as a matter of law that:

1.  The armed security guard . . . [a]cted as an agent for the State[.]

2.  The armed security guard is a State actor.

3.  There was lack of reasonable suspicion to stop.

4.  The search and seizure were unconstitutional.

5.  The evidence acquired beyond the stop and detention should be excluded.

The State challenges the following pertinent findings of fact in support of the trial court's conclusions of law above:

9. When Hunter suspected [d]efendant's impairment, he made him get out of his car and sit on the curb. The purpose of his encounter with [d]efendant then changed. No longer was he performing under Metro's contract. After issuing the civil citation his actions exceeded his contractual authority. His goal and purpose evolved into detaining [d]efendant until local law enforcement arrived to investigate a suspected impaired driver. His motivation was no longer personal to his employment. His primary intent was to serve law enforcement efforts.

10. His show of apparent lawful authority (flashing lights, uniform, badge, and gun) intimidated [d]efendant and made him feel compelled to wait outside his car for 45 minutes until WPD arrived.

21. Hunter likely had prior (and subsequent) handoff scenarios similar to the one in this case. His primary purpose when assisting law enforcement officers is to help them make arrests. He does not derive any personal benefit.

22. Various empirical measures suggest that private police outnumber public police forces. Private police forces in the United States near 1,000,000 officers. It is reasonable to assume that the factual scenario of this case occurs in all parts of this county, state, and nation on a regular basis.

23. Most state statutes only regulate a certain category of private police officers, leaving a substantial portion of the private policing industry virtually unregulated. Many state regulations of private police misunderstand, and thus inadequately protect against the threat posed by the private policing industry. Few statutes protect individuals from the potential social harms of the privatized police.

24. It is given that law enforcement officers are spread thin. Handoff cases occur on a regular basis. More times than imagined armed security guards arrest individuals and hold them for law enforcement officers who arrive on scene and make arrests. If law enforcement officers do not have to make the initial stop, and armed security guards detain individuals until they arrive, substantial time is saved.

34. Private security guards in North Carolina are subject to a high level of government regulation. North Carolina

has a comprehensive regulatory scheme for its private security guards. They are vetted, trained, and continue to be subject to disciplinary action under the aegis of the North Carolina Attorney General.

38. Although the state may not have advanced knowledge of every individual arrest and search undertaken by a private security guard, the same is true of its sworn law enforcement officers. The state cannot turn its back in ignorance on armed private security guards when they do exactly what they are trained, regulated, licensed, and authorized to do.

55. Hunter wore a uniform, displayed a badge, had a gun in its holster, and stopped [d]efendant's vehicle using the flashing lights of his marked patrol vehicle[.]

Finding #9 is supported by competent evidence. After Hunter stopped defendant's vehicle to issue defendant a civil citation, Hunter instructed defendant to sit on the curb and testified that he called city dispatch to respond to the scene for a possible DWI. Hunter subsequently waited with defendant until law enforcement arrived. Finding #55 is also supported by competent evidence because Hunter testified that he wore a uniform, had a gun, and drove a Metro Public Safety vehicle equipped with emergency flashing lights when he stopped defendant.

However, the record contains no competent evidence supporting findings #10, 21, 22, 23, 24, 34, and 38. Finding #10 purports that defendant was intimidated by Hunter's security uniform, badge, and holstered gun, and felt compelled to comply with Hunter's request to wait outside his vehicle. However, there is no testimony by defendant or evidence in the record concerning defendant's state of mind at the time of Hunter's request. Furthermore, Hunter testified that once he issued defendant a civil citation, he did not give defendant any further instructions and stopped all conversation with defendant. Finding #21 indicates that Hunter and the police had previous "handoff scenarios" similar to the case at bar. However, this is mere speculation by the trial court because neither Hunter nor Detective Tenney provided any testimony or evidence to support this finding.

Findings #22, 23, and 24 include empirical data concerning private police versus public police forces in the United States, a reference to a law review article from West Virginia stating that a "substantial portion of the private policing industry is virtually unregulated," and theorizes that because law enforcement officers "are spread thin[,]" handoff cases

between armed security guards and police occur on a frequent basis. Similarly, finding #34 relates to the "high" level of government regulation private security guards are subject to in this State. None of the witnesses elicited such evidence at the hearing. Admittedly, Rule 201 of the North Carolina Rules of Evidence permits a trial court to take judicial notice of facts that are not reasonably in dispute, with or without the request of counsel. N.C. Gen. Stat. 8C-1, Rule 201(b) (2011); *but see Hinkle v. Hartsell*, 131 N.C. App. 833, 837, 509 S.E.2d 455, 458 (1998) (holding that the trial court erred in taking judicial notice *sua sponte* of criminal activity in a community where prevalence of crime in that vicinity was a matter of public debate). Undeniably, whether these findings are accurate within this State is a fact reasonably in dispute.

Finding #38 purports to find that private security guards are trained, regulated, licensed and authorized by the State to arrest and search private citizens. This finding is based on evidence at the hearing that Hunter was "a security officer" as defined by N.C. Gen. Stat. § 74C-3 (2011). However, nothing in that statute authorizes a security guard to arrest and search private citizens.[2]

Accordingly, findings of fact #10, 21, 22, 23, 24, 34, and 38 are not binding on this Court because they are not supported by competence evidence. Thus, we only consider findings of fact #9 and #55 in addition to the unchallenged findings of fact in determining whether the trial court's findings of fact support its conclusion of law.

### b.) State Actor

The State argues that the trial court's remaining findings of fact binding on this Court do not support its legal conclusion that Hunter was a state actor. We agree.

---

2. N.C Gen. Stat. § 74C-3(a)(6) (2011) defines a security guard as:

   [a]ny person, firm, association, or corporation that provides a security guard on a contractual basis for another person, firm, association, or corporation for a fee or other valuable consideration and performs one or more of the following functions: (a) Prevention or detection of intrusion, entry, larceny, vandalism, abuse, fire, or trespass on private property. (b) Prevention, observation, or detection of any unauthorized activity on private property. (c) Protection of patrons and persons lawfully authorized to be on the premises or being escorted between premises of the person, firm, association, or corporation that entered into the contract for security services. (d) Control, regulation, or direction of the flow or movement of the public, whether by vehicle or otherwise, only to the extent and for the time directly and specifically required to assure the protection of properties.

"The fourth amendment as applied to the states through the fourteenth amendment protects citizens from unlawful searches and seizures committed by the government or its agents. This protection does not extend to evidence secured by private searches, even if conducted illegally." *State v. Sanders*, 327 N.C. 319, 331, 395 S.E.2d 412, 420 (1990), *cert. denied*, 498 U.S. 1051, 111 S.Ct. 763, 112 L.Ed.2d 782 (1991) (citation omitted). "The party challenging admission of the evidence has the burden to show sufficient government involvement in the private citizen's conduct to warrant fourth amendment scrutiny." *Id.* (citation omitted). A traffic stop is "considered a seizure" subject to the protections of the fourth amendment. *State v. Otto*, 366 N.C. 134, 136-37, 726 S.E.2d 824, 827 (2012) (internal quotation marks omitted). Reasonable suspicion is necessary to stop a vehicle, and it consists of "specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (citations omitted). Thus, a traffic stop conducted entirely by a non-state actor is not subject to reasonable suspicion because the fourth amendment does not apply.

In determining whether a private citizen is a state actor for the purposes of the fourth amendment, we use a totality of the circumstances approach that requires special consideration of 1.) "the citizen's motivation for the search or seizure," 2.) "the degree of governmental involvement, such as advice, encouragement, knowledge about the nature of the citizen's activities," and 3.) "the legality of the conduct encouraged by the police." *State v. Verkerk*, ___ N.C. App. ___, ___, 747 S.E.2d 658, 664 (2013) (citation and internal quotation marks omitted). Importantly, "[o]nce a private search [or seizure] has been completed, subsequent involvement of government agents does not transform the original intrusion into a governmental search." *State v. Kornegay*, 313 N.C. 1, 10, 326 S.E.2d 881, 890 (1985) (citation omitted).

A review of the trial court's applicable findings of fact reveals an absence of all three special considerations. No finding shows that Hunter's motivation was to assist law enforcement officials at the time he conducted the traffic stop. To the contrary, there is evidence in the record to show that Hunter's motivation in stopping defendant was to issue him a civil citation for violating community rules. Similarly, none of the findings indicate that the WPD or UNCW campus police recruited, requested or made any arrangement with Hunter, or encouraged him to stop and detain defendant. After Hunter called the WPD, Hunter ceased conversation with defendant, and law enforcement did not give Hunter

any instructions to detain defendant or conduct further investigation. The police merely responded to a "possible DUI[,]" and Hunter acted alone without any encouragement from law enforcement. Moreover, the subsequent arrival of the UNCW officer and Detective Tenney did not convert Hunter's private conduct to state action. *See Kornegay, supra.* Thus, Hunter was not a state actor, and his traffic stop of defendant did not require reasonable suspicion.

Even assuming *arguendo* that Hunter was a state actor, reasonable suspicion existed to conduct a traffic stop. Hunter observed defendant at 2:10 A.M in rainy weather conditions, traveling approximately 25 m.p.h. in a 15 m.p.h. zone, and crossing over the center street lines several times. The time, poor weather conditions, speed, and failure to maintain lane control provided Hunter with reasonable suspicion to stop defendant. *See State v. Thompson,* 154 N.C. App. 194, 197, 571 S.E.2d 673, 675-76 (2002) (reasonable suspicion found where defendant weaved within his lane early in the morning and exceeded the speed limit); *See also State v. Hudson,* 206 N.C. App. 482, 486, 696 S.E.2d 577, 581 (2010) (holding that an officer had reasonable suspicion to stop vehicle when evidence showed that the "[d]efendant crossed the center and fog lines twice[.]").

## III.  Conclusion

In sum, the trial court erred in granting defendant's motion to suppress because Hunter was not a state actor. Therefore, his traffic stop of defendant did not require reasonable suspicion. We reverse the trial court's order and remand for further proceedings.

Reversed and Remanded.

Judges McCULLOUGH and DAVIS concur.