Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/13/2025 09:09 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
ALDRICK SCOTT, APPELLANT.
___ N.W.3d ___

Filed June 13, 2025.    No. S-24-422.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. And where the facts are largely undisputed, the ultimate question is an issue of law.

2. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

3. ____: ____: ____. The relevant question in reviewing a criminal conviction for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution prohibit unreasonable searches and seizures.

5. ____: ____. Whether a search and seizure violates the general proscription against being unreasonable depends on the norms the Fourth Amendment was meant to preserve and an assessment of the degree to which it intrudes upon an individual's privacy versus being needed for the promotion of legitimate governmental interests.

6. **Constitutional Law: Statutes.** The Fourth Amendment was not intended to operate as a redundant guarantee incorporating subsequently enacted statutes.

7. **Constitutional Law: Warrantless Searches: Search and Seizure.** Under the warrant clause of the Fourth Amendment, warrantless searches and seizures are per se unreasonable, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.

8. **Constitutional Law: Search and Seizure: Evidence.** Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment generally cannot be used in a criminal proceeding against the victim of the illegal search and seizure.

9. **Constitutional Law: Evidence: Police Officers and Sheriffs.** The exclusion of evidence obtained in violation of the Fourth Amendment is not itself a constitutional right. Rather, it is a remedy designed to deter constitutional violations by U.S. law enforcement.

10. **Constitutional Law: Search and Seizure: Evidence.** The Fourth Amendment and the judicially created exclusionary rule do not generally apply to searches and seizures by foreign officials in foreign nations.

11. \_\_\_\_: \_\_\_\_: \_\_\_\_. Neither the 4th Amendment nor the 14th Amendment is directed at foreign officials, and it serves no prophylactic purpose to apply the exclusionary rule to evidence seized by foreign officials in foreign nations, since what U.S. courts do will not alter the search policies of sovereign nations.

12. \_\_\_\_: \_\_\_\_: \_\_\_\_. Evidence seized from a search by foreign authorities in their own countries is generally admissible in U.S. courts, even if the search does not otherwise comply with the Fourth Amendment.

13. **Search and Seizure: Evidence: Police Officers and Sheriffs: Joint Ventures.** An exception to the general rule that the exclusionary rule does not apply to evidence seized from a search by foreign authorities exists when U.S. law enforcement's participation in the search and seizure was so substantial as to constitute a "joint venture" between U.S. and foreign officials.

14. **Constitutional Law: Search and Seizure: Evidence.** Even if the Fourth Amendment's exclusionary rule applies to a foreign search and seizure, the evidence need not be suppressed unless the foreign search was unreasonable.

15. **Constitutional Law: Search and Seizure: Search Warrants.** The warrant clause of the Fourth Amendment has no extraterritorial application; thus, the conduct of foreign officials in foreign nations must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.

16. **Search and Seizure: Joint Ventures.** A joint venture is not created by U.S. officials' identification and notification of a suspect in a foreign country, provision of information to the foreign authorities, and request that the foreign authorities conduct a search or seizure.

17. \_\_\_\_: \_\_\_\_. The joint venture doctrine of search and seizure is a purposefully limited exception with a high threshold for a defendant to invoke it.

18. \_\_\_\_: \_\_\_\_. The question of whether a joint venture existed between U.S. law enforcement and foreign officials is dependent on the facts and circumstances of a case, and not one fact or circumstance, or combination thereof, is dispositive in this analysis.

19. **Search and Seizure: Evidence: Joint Ventures.** The general proposition being applied under the joint venture doctrine is that use of the exclusionary rule with respect to foreign searches is justifiable only when U.S. authorities may fairly be held accountable for not preventing the particular conduct complained of.

20. **Joint Ventures.** For a true joint venture to have occurred, U.S. officials must have been controlling or directing the conduct of the foreign parallel investigation.

21. **Constitutional Law: Search and Seizure.** Once a foreign search and seizure has been completed, subsequent involvement of U.S. governmental agents in the process of the foreign authorities voluntarily handing over the object they seized is not relevant to its admissibility under the Fourth Amendment.

22. **Evidence: Appeal and Error.** The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

23. **Homicide: Convictions: Proof.** The three elements the prosecution must prove beyond a reasonable doubt to obtain a conviction for first degree murder are as follows: The defendant (1) killed another person, (2) did so purposely, and (3) did so with deliberate and premeditated malice.

24. **Homicide: Intent: Words and Phrases.** Deliberate malice, for purposes of first degree murder, means not suddenly and not rashly, and it requires that the defendant considered the probable consequences of his or her act before doing the act.

25. \_\_\_\_: \_\_\_\_: \_\_\_\_. The term "premeditated" means to have formed a design to commit an act before it was done.

26. **Homicide: Intent.** One kills with premeditated malice if, before the act causing death occurs, one has formed the intent or determined to kill the victim without legal justification.

27. **Intent: Words and Phrases.** Premeditation is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.
28. **Intent.** A trier of fact may infer that the defendant intended the natural and probable consequences of the defendant's voluntary acts.
29. **Homicide: Intent: Time.** No particular length of time for premeditation is required, provided the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.
30. ____: ____: ____. The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.
31. **Criminal Law: Evidence.** A defendant's disposal, removal, or concealment of physical evidence in order not to get caught by law enforcement is evidence of the defendant's belief that an official proceeding was pending or about to be instituted at the time he or she disposed of, removed, or concealed the evidence.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Mary Mullin Dvorak for appellant.

Michael T. Hilgers, Attorney General, Lincoln J. Korell, and Eric J. Hamilton for appellee.

FUNKE, C.J., MILLER-LERMAN, CASSEL, STACY, PAPIK, FREUDENBERG, and BERGEVIN, JJ.

FREUDENBERG, J.
## I. INTRODUCTION
The defendant was convicted by jury of first degree murder, use of a deadly weapon (firearm) to commit a felony, and tampering with physical evidence. He assigns that the evidence was insufficient to sustain his convictions and that the district court erred by denying his motion to suppress the evidence produced from his arrest and detention by Belizean police. We affirm.

## II. BACKGROUND

Aldrick Scott's charges arose after he shot and killed his former girlfriend in her house, buried her body, and disposed of other evidence. Scott was tried on an amended information charging him with first degree murder, a Class IA felony; use of a deadly weapon (firearm) to commit a felony, a Class IC felony; and tampering with physical evidence, a Class II felony. At trial, Scott asserted that "the gun went off" and that he was not guilty because he had acted in self-defense.

Following trial, the jury returned a guilty verdict on all three counts, which the court accepted. The court sentenced Scott to life imprisonment for first degree murder, 30 to 40 years' imprisonment for use of a deadly weapon (firearm) to commit a felony, and 15 to 20 years' imprisonment for tampering with physical evidence. The court ordered Scott's sentences to be served consecutively.

### 1. Evidence Presented at Trial

The evidence adduced at trial showed that on November 20, 2022, Omaha, Nebraska, law enforcement responded to a call for a potential missing persons report made by Cari Allen's ex-husband. Allen's ex-husband and son had visited Allen's house, where they found the front door ajar, Allen's car in the garage, and holes in the upstairs interior walls and Allen's bedroom door that had been "hastily" patched with spackling and wood glue. The holes had not been there a few days earlier when Allen's son last visited, and Allen would not have patched them up herself. Allen was not found in her home.

After arriving at the scene, law enforcement observed the holes and believed they were consistent with the trajectory of a gunshot that originated in Allen's bedroom and traveled through her door and the walls. However, no bullet casings were found at the scene. Allen's family and friends did not believe that she owned a firearm or would have had one in her house. Other than the holes, law enforcement did not find any evidence of a firearm in Allen's home. Law enforcement found no signs of a struggle or fight.

Law enforcement learned Allen had a Snapchat social media account, which allowed her to continuously share her location with other users. Allen's ex-husband told an officer that he could no longer see her location like he usually could, which indicated to him that her cell phone had been shut off. Law enforcement also learned that the night before, Allen had gone on a first date at a local bar. At about 11:30 that night, Allen had texted a friend that during the date, she had to turn her cell phone off because Scott had repeatedly called her. Law enforcement learned that Allen had broken up with Scott a few weeks prior. Before Scott and Allen's breakup, a friend saw Scott use the code to Allen's garage to gain entry into her house.

The next morning, law enforcement had a phone call with Scott, who resided in Topeka, Kansas. During this conversation, Scott denied knowing where Allen was or having been in Omaha on November 19 or 20, 2022. Scott also told law enforcement that as far as he knew, Allen did not own a firearm or have access to one. After speaking with Scott, law enforcement determined that he was a person of interest, so officers traveled to Topeka to try to interview him.

Upon their arrival in Topeka later that day, the officers learned from local law enforcement that a friend of Scott's had received a phone call from Scott in which he admitted to killing his girlfriend. Scott's friend testified that Scott had called her, told her that he had gotten into an argument with his girlfriend, and stated, "I killed her." Scott's friend thought Scott was joking until Scott asserted that he was not joking and needed her to be serious about what he was saying.

After learning of the call, the officers visited Scott's home, which they found in a state of disarray. Scott was not found in his home. Scott's friend then informed law enforcement that Scott had initially told her that he had flown to Cancun, Mexico. Law enforcement later confirmed that Scott had arrived in Cancun earlier that day, November 21, 2022. Scott's car was located parked at an airport near Topeka. Law

enforcement discovered a loaded firearm and ammunition in Scott's car.

During its investigation, law enforcement obtained video footage of outside the bar and outside of Allen's house; location data from Scott's and Allen's Snapchat accounts, as well as Scott's car; cell phone data for Scott's and Allen's phone numbers; and messages from Scott's and Allen's Facebook and Snapchat accounts. This data and video evidence established that on November 19, 2022, Allen arrived at the bar at about 7:15 p.m. About 15 minutes later, Scott had already left his home and was driving out of Topeka toward the bar in Omaha.

Scott arrived at the bar at about 10:15 p.m., and Scott's car circled the bar's parking lot for several minutes. At that time, Allen was inside the bar with her date. Scott then left the area and drove toward Allen's house.

At about 10:30 p.m., Scott was in the immediate area around Allen's house, and his car passed the house and turned onto a nearby street. Scott traveled to an area with new construction that was a couple of blocks away from Allen's house and parked in that area. About a minute later, Scott walked back to the immediate area around Allen's house. Scott made three phone calls to Allen between about 10:30 and 10:45 p.m., and this was the first time Scott contacted Allen that day. Allen did not answer the calls. Scott then messaged Allen via Snapchat, "'Can't sleep, how are you.'" Scott called Allen a fourth time, which was answered, and the call lasted about 1½ minutes.

Allen's car arrived near her home at about 11:30 p.m., which was about an hour after Scott had arrived in the area. After Allen arrived home, she made four phone calls to Scott, all of which went to voicemail. Shortly after her fourth call, Scott messaged Allen via Facebook, saying that his cell phone had died. Scott and Allen exchanged messages for a bit, which included Scott's stating that it "'[s]ounded like [Allen was] on a date,'" telling Allen to "'[g]et some sleep,'" and expressing how he was "'angry and upset.'" The last

message in Scott and Allen's exchange was Scott's saying, "'I have lost everything,'" at 12:15 a.m. on November 20, 2022. Law enforcement testified that Scott's and Allen's messages indicated that Allen did not know Scott was in Omaha and that she believed he was still in Topeka. Law enforcement believes that Allen was in her home for at least 45 minutes before something happened.

The data and video evidence further indicated that Scott remained near Allen's house from about 10:30 p.m. on November 19, 2022, to 2:30 a.m. on November 20. Sometime between 2 and 2:30 a.m., Allen's car drove away from her house and turned on the same nearby street where Scott's car had earlier. Allen's car then drove back toward her house at about 3 a.m. About 30 minutes later, Scott ran toward the street where his and Allen's cars had turned. Shortly after, at about 3:30 a.m., Scott traveled back toward Topeka.

Scott arrived at his home in Topeka a few hours later. Later that morning, Scott traveled to an abandoned farmhouse in Topeka. Local law enforcement ultimately searched that location and discovered the buried remains of a female body, later identified as Allen. The forensic pathologist who performed Allen's autopsy testified that a gunshot went through her right breast and into her liver, lung, and kidney, which ultimately killed her. The forensic pathologist also testified that Allen's body had no defense wounds and opined that it is unlikely that Allen was shot at close range or with the end of the firearm's barrel in direct contact with her body.

Scott testified in his defense and claimed he shot Allen in self-defense. Scott had received martial arts training while he was in the military and was experienced with firearms. Scott owned a gun that he typically stored in his car with ammunition. Scott kept his gun loaded. Scott testified that he did not know Allen had a firearm.

The year prior, Scott and Allen met through an online dating application. Scott soon met Allen in person and spent the weekend with her in Omaha for the first time. Scott and

Allen's relationship progressed, and Scott started driving from Topeka to Omaha at least every other weekend to visit her. Scott would usually drive to Omaha on Saturday, stay overnight in Allen's bedroom at her house, and leave for Topeka on Sunday. Scott and Allen shared their locations with each other through Snapchat, and they communicated almost daily during their relationship.

About a month before the shooting, Scott and Allen began "drifting apart" and discussed ending their relationship. After this conversation, Scott and Allen still communicated but not as much as they had before. While the breakup conversation left Scott "kind of discouraged," he testified that "[t]o an extent, [he] thought [they] were still together" and "thought [they] just had a hiccup" in their relationship.

Scott testified that on the weekend of November 4, 2022, he drove to Omaha in hopes of seeing Allen. He did not tell Allen in advance that he would be in Omaha. Scott testified that he got a hotel room because he was unsure whether Allen wanted to see him. Scott testified that he called Allen the next day and that she invited him over to her house, where they were "intimate" before Scott ultimately spent the night. Scott testified that after that visit, he thought that he and Allen were getting back together.

Scott drove to Omaha again on the weekend of November 19, 2022, in hopes, he testified, of seeing Allen and being intimate with her again. Scott testified that he left for Omaha later than he normally did because he had conflicting feelings about visiting Allen and was unsure whether she wanted to see him. Scott admitted that he did not contact Allen before he drove to Omaha and stated that Allen had not told Scott that she was going on a date that night.

Scott testified that he drove to the bar because Allen's Snapchat location tracker indicated she was there. Once he arrived, Scott drove around the parking lot looking for Allen's car and, at one point, briefly got out of his car to look around before driving to Allen's house.

Scott testified that once he arrived at Allen's house, he knocked on the door, but no one answered. Scott testified that he then parked his car on a nearby street at least a couple of blocks away from Allen's house, but he denied parking in the area with construction. Scott checked Allen's location on Snapchat, which showed she was still at the bar, and he then walked back to Allen's house. Scott testified that he left his loaded gun in his car and denied bringing it with him to Allen's house. Scott testified that he waited outside Allen's house until she arrived. Scott denied having a key to Allen's house or knowing the code to her garage. Scott testified that while waiting for Allen, he called her four times. When Allen answered his fourth call, Scott asked her what she was doing, and Allen told him that she was having drinks with her friend. During the call, Allen seemed "irritated" with Scott, and they were "kind of upset with each other."

Scott testified that when Allen drove up to her house, he moved toward a side of her house where Allen could not see him. Scott testified that he thought Allen was potentially on a date and in the car with someone else and that he wanted to "catch her in the lie." At some point, Scott knocked on Allen's door again. Scott testified that Allen seemed upset that he was there but let him inside. According to Scott, for about 10 to 15 minutes, he and Allen had an argument in which Scott accused Allen of cheating on him. Allen then told Scott that she needed to go upstairs to get something, and he followed her to her bedroom.

Scott testified that, in the bedroom, he and Allen were still arguing when Allen pulled out a firearm and said, "I'm going to hurt you, and you're not going to hurt me." Scott testified that he rushed Allen to get the firearm away from her, they fumbled with it, and then it went off. Allen died shortly after. Scott testified that he had not planned or intended to kill Allen and that after she died, he was "freaking out" and "panicking."

Scott testified he put Allen's body in her car, drove her car to where his car was parked, and then moved her body to his

car. Scott then drove Allen's car back to her house, where he patched the holes in the walls. Scott testified that when he left Allen's home, he took Allen's firearm, the bullet casing, and Allen's cell phone with him. Scott then drove to his home in Topeka, wrapped Allen's body in trash bags, drove to the abandoned farmhouse, and buried her body there. Later, Scott messaged Allen on Snapchat as if he did not know she was dead. Scott testified that during his phone call with law enforcement, he lied about when he had last seen Allen and where he had been that weekend because he was afraid. Scott testified that after the call, he "was scared" and purchased a plane ticket to Cancun for that same day. Scott testified that he disposed of Allen's firearm and the bullet casing in the airport parking garage. Scott testified that once he arrived in Cancun, he made internet searches about Allen, extradition, and places where he could avoid law enforcement in Belize. Scott testified that he had "look[ed] up everything possible to escape." Scott decided to travel to Belize because it was the "easiest way to escape."

## 2. ARREST AND MOTION TO SUPPRESS

On November 23, 2022, Scott was charged in Nebraska with kidnapping and accessory to a felony, and a warrant was issued for his arrest. He was ultimately arrested, searched, and detained by Belizean police before being deported, not extradited, to the United States.

Before trial, Scott moved to suppress the evidence obtained through the Belizean police's arrest and search, specifically his cell phone. Scott argued that he was detained and searched in violation of Belizean immigration law and Belize's extradition treaty with the United States. Scott also argued that because his arrest and search were a joint venture between Belizean police and U.S. law enforcement, the evidence was subject to the exclusionary rule under the Fourth Amendment.

At a hearing on the motion, evidence was adduced that Nebraska law enforcement informed federal authorities of the

arrest warrant for Scott. On December 3, 2022, the Diplomatic Security Service of the U.S. Embassy in Belize received information from a Belizean citizen that Scott was a wanted fugitive and was residing in Caye Caulker, Belize. U.S. law enforcement contacted the Belizean citizen to obtain more information about Scott's location. The Belizean citizen provided a recent picture of Scott, which U.S. law enforcement confirmed was a likely match to Scott.

U.S. law enforcement confirmed there was an arrest warrant for Scott with full extradition and confirmed with Belizean immigration authorities that Scott had entered Belize illegally. U.S. law enforcement then informed Belizean police that Scott, a U.S. fugitive, was potentially in Belize and requested their assistance in apprehending him. U.S. law enforcement maintained contact with the Belizean citizen while Belizean police and authorities searched for Scott. On December 6, 2022, Belizean police located and arrested Scott.

Belizean police searched Scott and, at some point while Scott was in Belizean custody, seized his property, including his cell phone. After Scott's arrest, U.S. law enforcement positively identified Scott and verified the identity documents found in Scott's possession. Scott was detained by Belizean police overnight. The next day, the Belizean immigration authorities issued an "Order to Leave Belize" for Scott because he was a "'prohibited immigrant'" under Belizean immigration law. Scott was ordered to leave Belize "[i]mmediately." That same day, Scott was deported from Belize and transported to the United States while accompanied by Belizean police. U.S. law enforcement arranged and funded Scott's return to the United States. U.S. law enforcement stated in an email that it "got [Belizean immigration authorities] to issue an order to leave."

Once Scott arrived in the United States, he was taken into custody by U.S. Customs and Border Protection before being transferred to the custody of local law enforcement. Scott ultimately waived interstate extradition and was transferred

to the custody of Nebraska law enforcement. The property that Belizean police seized from Scott, including his cell phone, was eventually given to Nebraska law enforcement.

The district court overruled Scott's motion to suppress and, later, his renewed motion at trial. In its order overruling Scott's motion, the court noted that Scott "was arrested in Belize by Belizean authorities for violating Belizean immigration law" and was deported instead of extradited from Belize. In addition, the court concluded that U.S. law enforcement had not substantially participated in his search and that Belizean police had not acted as agents for U.S. law enforcement.

The court added that Belizean police conducted the "primary search" of Scott and that U.S. law enforcement only passed along information to Belizean police about Scott's presence there, which the court concluded did not amount to substantially participating in Scott's arrest. The court stated that although U.S. law enforcement discussed Scott's location with Belizean police, there was no evidence that U.S. law enforcement directed or controlled the actions of Belizean police.

At trial, the jury was presented evidence that Nebraska law enforcement conducted a physical examination of Scott's cell phone and found internet searches about the status of the investigation into Allen's disappearance, obtaining a counterfeit Belizean identification card, and avoiding detection by Belizean law enforcement.

## III. ASSIGNMENTS OF ERROR

Scott assigns that (1) the district court erred by denying his motion to suppress the evidence derived from the physical examination of his cell phone gained through his arrest and detention in Belize and (2) there was insufficient evidence to sustain his convictions.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of

review.[1] Regarding historical facts, an appellate court reviews the trial court's findings for clear error.[2] Whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[3] And where the facts are largely undisputed, the ultimate question is an issue of law.[4]

[2] In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[5]

[3] The relevant question in reviewing a criminal conviction for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[6]

## V. ANALYSIS

Scott asserts that the district court erred by denying his motion to suppress the evidence obtained through his arrest, search, and detention by Belizean police. Scott also asserts that there was insufficient evidence to support his convictions of first degree murder, use of a deadly weapon (firearm) to commit a felony, and tampering with physical evidence. We reject Scott's arguments and affirm the judgment of the district court.

---

[1] *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *State v. Kilmer*, 318 Neb. 148, 13 N.W.3d 717 (2024).

[6] See *id.*

## 1. Motion to Suppress

Scott argues the cell phone evidence obtained through Belizean police's arrest, search, and detention of him should have been suppressed under the Fourth Amendment's exclusionary rule. According to Scott, he was illegally searched and detained under the Belize Immigration Act and was not afforded the procedural safeguards of the extradition treaty between the United States and Belize. Scott argues his arrest and the subsequent search fall under the "joint venture" exception to the general rule that the Fourth Amendment and the exclusionary rule do not apply to evidence seized from a search by foreign authorities in their own countries. Scott does not assert that any other exception applies.

[4-7] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution prohibit unreasonable searches and seizures.[7] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Whether a search and seizure violates the general proscription against being unreasonable depends on the norms the Fourth Amendment was meant to preserve and an assessment of the degree to which it intrudes upon an individual's privacy versus being needed for the promotion of legitimate governmental interests.[8] The Fourth Amendment was not intended to operate as a redundant guarantee incorporating subsequently enacted statutes.[9] Under the warrant clause of the Fourth

---

[7] *State v. Simons*, 315 Neb. 415, 996 N.W.2d 607 (2023).

[8] See *Virginia v. Moore*, 553 U.S. 164, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008).

[9] See *id.* See, also, e.g., *U.S. v. Ryan*, 731 F.3d 66 (1st Cir. 2013); 2 Wayne R. LaFave et al., Criminal Procedure § 3.1(e) (4th ed. 2015) (Fourth Amendment exclusionary rule and other remedies).

Amendment, warrantless searches and seizures are per se unreasonable, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.[10]

[8,9] Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment generally cannot be used in a criminal proceeding against the victim of the illegal search and seizure.[11] The exclusion of evidence obtained in violation of the Fourth Amendment is not itself a constitutional right.[12] Rather, it is a remedy designed to deter constitutional violations by U.S. law enforcement.[13]

[10-13] The Fourth Amendment and the judicially created exclusionary rule do not generally apply to searches and seizures by foreign officials in foreign nations.[14] Neither the 4th Amendment nor the 14th Amendment is directed at foreign officials, and it serves no prophylactic purpose to apply the exclusionary rule to evidence seized by foreign officials in foreign nations, since what we do will not alter the search policies of sovereign nations.[15] As a result, evidence seized from a search by foreign authorities in their own countries is generally admissible in U.S. courts, even if the search does not otherwise comply with the Fourth Amendment.[16] An exception to the general rule that the exclusionary rule does not apply

---

[10] *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021).

[11] *State v. Simons, supra* note 7.

[12] *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020).

[13] See *id.*

[14] See, Annot., 3 A.L.R. Fed. 3d Art. 4, § 1 (2015); 68 Am. Jur. 2d *Searches and Seizures* § 41 (2020). See, also, *State v. Barajas*, 195 Neb. 502, 238 N.W.2d 913 (1976).

[15] See *State v. Barajas, supra* note 14. See, also, e.g., *U.S. v. Pierson*, 73 F.4th 582 (8th Cir. 2023).

[16] See 29 Am. Jur. 2d *Evidence* § 586 (2019). See, also, *U.S. v. Stokes*, 726 F.3d 880 (7th Cir. 2013); *U.S. v. Emmanuel*, 565 F.3d 1324 (11th Cir. 2009).

to evidence seized from a search by foreign authorities exists when U.S. law enforcement's participation in the search and seizure was so substantial as to constitute a "joint venture" between U.S. and foreign officials.[17]

[14] We observe at the outset that even if the Fourth Amendment's exclusionary rule applies to a foreign search and seizure, the evidence need not be suppressed unless the foreign search was unreasonable.[18] Scott believes the search and seizure of his cell phone by Belizean police was unreasonable because it allegedly violated the Belize Immigration Act and the extradition treaty between the United States and Belize. Particularly, Scott complains that he was arrested without a warrant or the necessary supporting documentation for a provisional arrest and that he was not afforded a hearing before a magistrate to determine if he should be detained in custody.

[15] The warrant clause of the Fourth Amendment has no extraterritorial application[19]; thus, the conduct of foreign officials in foreign nations must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.[20] Other than pointing to the alleged violations of law, Scott does not explain how the search that led to the discovery of his cell phone or its seizure was constitutionally unreasonable. In any event, because we ultimately hold that the cell phone was not seized by Belizean police pursuant to a joint venture with U.S. governmental authorities, we need not address whether the alleged violations of a foreign law and a treaty agreement violated the Fourth Amendment's general proscription against unreasonable searches and seizures.

---

[17] See *State v. Barajas, supra* note 14, 195 Neb. at 506, 238 N.W.2d at 915. See, also, Annot., 3 A.L.R. Fed. 3d Art. 4, *supra* note 14, § 6.

[18] *U.S. v. Getto*, 729 F.3d 221 (2d Cir. 2013).

[19] See, *U.S. v. Stokes, supra* note 16; *U.S. v. Barona*, 56 F.3d 1087 (9th Cir. 1995). See, also, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990).

[20] *U.S. v. Getto, supra* note 18; *U.S. v. Barona, supra* note 19.

We adopted the joint venture exception in *State v. Barajas*.[21] In *Barajas*, we held that there was insufficient evidence of a joint venture for the Fourth Amendment to apply to Mexican authorities' search and seizure from a residence in Mexico where Nebraska law enforcement had requested that the Mexican authorities search the residence for specific evidence and had supplied the address to be searched.[22] We said, "A greater activity by the American police is required before there is a joint venture . . . ."[23]

[16] This is consistent with other jurisdictions. A joint venture is not created by U.S. officials' identification and notification of a suspect in a foreign country, provision of information to the foreign authorities, and request that the foreign authorities conduct a search or seizure.[24]

[17-20] The "'joint venture' doctrine is a purposefully limited exception" with a "high threshold for a defendant to invoke it."[25] The question of whether a joint venture existed between U.S. law enforcement and foreign officials is dependent on the facts and circumstances of a case, and not one fact or circumstance, or combination thereof, is dispositive in this analysis.[26] But "[t]he general proposition being applied is that use of the exclusionary rule with respect to foreign searches is justifiable only when American authorities may fairly be held accountable for not preventing the particular conduct complained of."[27]

---

[21] *State v. Barajas, supra* note 14.

[22] *Id*.

[23] *Id.* at 506, 238 N.W.2d at 916.

[24] See, *U.S. v. Pierson, supra* note 15; *U.S. v. Behety*, 32 F.3d 503 (11th Cir. 1994); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976); *U.S. v. Flath*, 845 F. Supp. 2d 951 (E.D. Wis. 2012); *U.S. v. Adler*, 605 F. Supp. 2d 829 (W.D. Tex. 2009).

[25] *U.S. v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1371 (N.D. Ga. 2001).

[26] See, *U.S. v. Lee*, 723 F.3d 134 (2d Cir. 2013); *U.S. v. Barona, supra* note 19.

[27] 1 Wayne R. LaFave, Search & Seizure, A Treatise on the Fourth Amendment § 1.8(h) at 466 (6th ed. 2020).

In other words, for a true joint venture to have occurred, U.S. officials must have been "'controlling or directing the conduct of the foreign parallel investigation.'"[28]

The facts and circumstances in the instant case fail to show that the involvement of U.S. officials in the Belizean police's arrest, search, and detention of Scott or their seizure of his property was so substantial as to be a joint venture. Belizean police alone executed Scott's arrest and detention, during which they seized Scott's property. The involvement of U.S. law enforcement mainly consisted of communicating with the Belizean informant about Scott's location, confirming with Belizean authorities that Scott had entered Belize illegally, notifying Belizean police that Scott was a U.S. fugitive who was potentially in Belize, requesting Belizean police's assistance in apprehending Scott, and identifying Scott and confirming the details of his arrest warrant. The record does not suggest that U.S. law enforcement was involved in Belizean police's decisions regarding their execution of Scott's arrest, their seizure of evidence from him, or their detention of him overnight.

[21] Scott argues that U.S. law enforcement also arranged and funded his flight to the United States and somehow compelled the Belizean immigration authorities to issue its order for him to leave. These actions pertain to Scott's deportation after the cell phone was seized. As with the application of a similar doctrine to the fruits of a private search, once a foreign search and seizure has been completed, subsequent involvement of U.S. governmental agents in the process of the foreign authorities' voluntarily handing over the object they seized is not relevant to its admissibility under the Fourth Amendment.[29]

---

[28] *U.S. v. Pierson, supra* note 15, 73 F.4th at 590.

[29] See *U.S. v. Maturo*, 982 F.2d 57 (2d Cir. 1992). See, also, *U.S. v. Lee, supra* note 26; *State v. Weaver*, 231 N.C. App. 473, 752 S.E.2d 240 (2013).

The involvement of U.S. law enforcement did not amount to its substantial participation in Belizean police's arrest, search, and detention of Scott or seizure of Scott's cell phone.[30] Thus, U.S. law enforcement was not in a joint venture with Belizean police,[31] who had enforced their own laws while executing the arrest, search, and detention before deporting Scott as a "'prohibited immigrant'" under the authority of their own immigration law. Therefore, the district court did not err in denying Scott's motion to suppress the evidence that Belizean police seized.

[22] For the sake of completeness, we also find that the admission of the evidence derived from the seizure of Scott's cell phone was harmless. The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[32] At trial, the evidence from Scott's cell phone was limited to his internet searches about Allen's disappearance, obtaining a counterfeit Belizean identification card, and avoiding Belizean law enforcement. Scott testified at trial about these same acts, i.e., his internet searches regarding Allen, extradition, and where he could avoid law enforcement in Belize. Scott also testified that he was "looking up everything possible to escape." Because Scott's testimony was cumulative of the evidence derived from the seizure of his cell phone, the admission of Scott's cell phone evidence was harmless error. The district court did not commit reversible error in denying Scott's motion to suppress.

## 2. Insufficient Evidence

Scott next argues there was insufficient evidence of his intent for the jury to find him guilty of first degree murder,

---

[30] See *State v. Barajas, supra* note 14.

[31] See *U.S. v. Pierson, supra* note 15.

[32] *State v. Rush, supra* note 1.

use of a deadly weapon (firearm) to commit a felony, and tampering with physical evidence. Our standard of review is the same for evidence that is direct, circumstantial, or a combination thereof: We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact.[33] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[34] We find that a rational trier of fact could have found the essential elements of all three crimes beyond a reasonable doubt.

(a) First Degree Murder

[23] Scott was convicted of first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Cum. Supp. 2024), which provides in pertinent part: "A person commits murder in the first degree if he or she kills another person (1) purposely and with deliberate and premeditated malice . . . ." The three elements the prosecution must prove beyond a reasonable doubt to obtain a conviction for first degree murder are as follows: The defendant (1) killed another person, (2) did so purposely, and (3) did so with deliberate and premeditated malice.[35]

[24-26] Scott does not dispute that he killed Allen and did so purposely. Instead, he argues there was insufficient evidence that he killed Allen with premeditated malice. Deliberate malice, for purposes of first degree murder, means not suddenly and not rashly, and it requires that the defendant considered the probable consequences of his or her act before doing the act.[36] The term "premeditated" means to have formed a

---

[33] *State v. Kilmer, supra* note 5.

[34] *Id.*

[35] *Id*.

[36] *Id*.

design to commit an act before it was done.[37] One kills with premeditated malice if, before the act causing death occurs, one has formed the intent or determined to kill the victim without legal justification.[38]

[27,28] Premeditation is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.[39] A trier of fact may infer that the defendant intended the natural and probable consequences of the defendant's voluntary acts.[40]

[29,30] No particular length of time for premeditation is required, provided the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.[41] The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.[42]

Scott asserts that the evidence failed to show he had a motive to kill Allen at the time he left Topeka and visited her house in Omaha. He argues that the evidence showed he simply intended to reconcile with Allen and that there was no evidence Allen had told him about her date. Scott argues that, without a motive, no rational finder of fact could have found that, at that time, he had a premeditated intent to kill Allen.

---

[37] *Id.*; *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024).

[38] *State v. Kilmer, supra* note 5; *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

[39] See, *State v. Kilmer, supra* note 5; *State v. Barnes, supra* note 37; *State v. Miranda, supra* note 38.

[40] *State v. Kilmer, supra* note 5; *State v. Yah*, 317 Neb. 730, 11 N.W.3d 632 (2024).

[41] See, *State v. Kilmer, supra* note 5; *State v. Barnes, supra* note 37; *State v. Miranda, supra* note 38.

[42] *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). See, also, *State v. Kilmer, supra* note 5.

Scott further argues there was insufficient evidence that he killed with deliberate and premeditated malice, because the trial evidence, including his testimony, showed that, after Allen's death, he acted in panic and without a clear plan, which he claims indicates that he did not have a premeditated intent to kill Allen.

Even if we were to assume that the evidence failed to establish that Scott had a motive or the premeditated intent to kill Allen when he drove to Omaha or arrived at her house, Scott could have formed the requisite intent, and a motive, at any moment thereafter leading up to the shooting. And there was circumstantial evidence that Scott's motive to kill Allen was jealousy. Scott and Allen had broken up a few weeks before Allen's death, and Scott drove from Topeka to the bar in Omaha because Allen's location on Snapchat indicated she was there on a date. Scott called Allen multiple times during the date, which prompted Allen to turn her cell phone off. When Allen answered Scott's fourth call, Allen told Scott that she was having drinks with her friend. Scott waited in hiding at Allen's house because he wanted to "catch her in the lie." Scott expressed to Allen how he was "'angry and upset'" and had "'lost everything.'" During Scott and Allen's in-person argument preceding the shooting, Scott accused Allen of cheating on him.

Evidence of Scott's planning activity also supports the jury's finding of premeditation. Scott parked his car at least a couple of blocks away from Allen's house in an area with new construction, where it could not be seen from Allen's house and fewer people would be around to see him. Allen's friends and family, and Scott himself, did not believe that Allen owned a firearm or had one in her home. Scott admitted, however, that he had a loaded gun in his car on the night of Allen's death.

We decline Scott's invitation to reweigh the evidence. There was sufficient evidence to support his conviction of murder in the first degree.

### (b) Use of Deadly Weapon to Commit Felony

Scott was convicted of use of a deadly weapon (firearm) to commit a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 2016). Scott argues the evidence was insufficient for his use conviction because there was insufficient evidence to convict him of the underlying felony of first degree murder. Scott does not dispute that he killed Allen or that she died from a gunshot wound to her chest. Since there was sufficient evidence of Scott's premeditation for the jury to convict him of first degree murder, we find that the evidence was also sufficient to convict Scott of use of a deadly weapon (firearm) to commit a felony.

### (c) Tampering With Physical Evidence

Lastly, we address Scott's challenge to the sufficiency of the evidence to support his conviction of tampering with physical evidence, in violation of Neb. Rev. Stat. § 28-922(1)(a) (Cum. Supp. 2024). Section 28-922 provides, in pertinent part:

> (1) A person commits the offense of tampering with physical evidence if, believing that an official proceeding is pending or about to be instituted and acting without legal right or authority, he . . .
>
> (a) [d]estroys, mutilates, conceals, removes, or alters physical evidence with the intent to impair its verity or availability in the pending or prospective official proceeding[.]

Scott does not dispute that the evidence at trial showed he removed and concealed Allen's body, her cell phone, the firearm that he claimed was Allen's, and the bullet casing. Scott also does not deny that, in doing so, he acted without legal right or authority and with the intent to impair the physical evidence's verity or availability in a pending or prospective official proceeding. Instead, Scott asserts there was insufficient evidence to show he "believe[ed] that an official proceeding [was] pending or about to be instituted," as contemplated in § 28-922(1), at the time he removed and concealed

the physical evidence. Scott relies on the fact that he had removed and concealed the physical evidence before any official proceedings commenced, which he asserts was when his arrest warrant was issued. This fact does not prevent the jury from reasonably inferring that Scott believed an official proceeding was about to be instituted.

Neb. Rev. Stat. § 28-916.01(7) (Cum. Supp. 2024) defines "[o]fficial proceeding" as used in § 28-922(1) as "a proceeding heard or which may be heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or deposition in connection with any such proceeding."

The phrase "believing that an official proceeding is pending or about to be instituted" in § 28-922(1) is identical or very similar to the language of other states' statutes.[43] The phrase is also very similar to that found in a section of the Model Penal Code.[44]

The Model Penal Code and Commentaries provides that "'the word "about" should be construed more in the sense of *probability* than temporal relation.'"[45] Secondary authority explains that under statutes modeled after the Model Penal Code, "'[i]t is important that the accused recognize that his conduct threatens obstruction of justice, but it is not critical

[43] See, Colo. Rev. Stat. Ann. § 18-8-610(1) (West 2023) ("believing that an official proceeding is pending or about to be instituted"); Conn. Gen. Stat. Ann. § 53a-155(a) (West 2023) ("believing that a criminal investigation conducted by a law enforcement agency or an official proceeding is pending, or about to be instituted"); Ky. Rev. Stat. Ann. § 524.100(1) (LexisNexis 2014) ("believing that an official proceeding is pending or may be instituted").

[44] A.L.I., Model Penal Code and Commentaries § 241.7 (1980). See Lawrence Solum & Stephen Marzen, *Truth and Uncertainty: Legal Control of the Destruction of Evidence*, 36 Emory L. J. 1085 (1987).

[45] *State v. Jordan*, 314 Conn. 354, 379, 102 A.3d 1, 15 (2014) (quoting Model Penal Code and Commentaries, *supra* note 44).

that [the accused] believe that a proceeding or investigation will commence within a certain time.'"[46]

In *State v. Foreshaw*,[47] the Supreme Court of Connecticut addressed language identical to § 28-922(1) and found the evidence sufficient to support a conviction of tampering with physical evidence when the defendant had thrown her firearm out of her car while fleeing from the location where she had killed the decedent. The defendant argued the evidence was insufficient to show she believed an official proceeding was "'about to be instituted'" because she had discarded the physical evidence before she had any contact with law enforcement or the judicial system.[48] The court disagreed. The court noted the evidence presented at trial included that there were multiple witnesses to the shooting and that the defendant had admitted to discarding the firearm "so that she would not be caught with it."[49] As explained in a later case, *State v. Jordan*,[50] the jury in *Foreshaw* could have reasonably concluded that the defendant "believed an official proceeding was 'about to be instituted' based on the fact that [the defendant] shot the [decedent] in the presence of numerous witnesses and anticipated being 'caught' by the police."

The Supreme Court of Kentucky in *Phillips v. Com.*[51] rejected the defendant's argument that there was insufficient evidence he removed and concealed items because they were physical evidence that might be used in an official proceeding. The defendant in *Phillips* removed and disposed of two spent cartridges and a firearm after he was involved in a shooting

---

[46] Solum & Marzen, *supra* note 44 at 1115-16.

[47] *State v. Foreshaw*, 214 Conn. 540, 572 A.2d 1006 (1990). See, also, *State v. Jordan, supra* note 45.

[48] See *State v. Foreshaw, supra* note 47, 214 Conn. at 550, 572 A.2d at 1012.

[49] *Id*.

[50] *State v. Jordan, supra* note 45, 314 Conn. at 379, 102 A.3d at 15 (quoting *State v. Foreshaw, supra* note 47).

[51] *Phillips v. Com.*, 17 S.W.3d 870 (Ky. 2000).

that resulted in one death.[52] Relying on its prior holding in *Burdell v. Com.*[53] that "one who conceals or removes evidence of criminal activity contemporaneously with the commission of his crime commits the offense of tampering with physical evidence," the court in *Phillips* elaborated that "'one who has committed a criminal act and then conceals or removes the evidence of his crime does so in contemplation that the evidence would be used in an official proceeding which might be instituted against him.'"[54] In concluding that the evidence was sufficient to support the defendant's conviction of tampering with physical evidence, the court in *Phillips* reasoned that "[the defendant's] actions immediately following and within [24] hours of the shooting clearly inferred guilty knowledge and an intent to conceal the circumstances of [the decedent's] death and [the defendant's] involvement therein."[55]

The Colorado Court of Appeals reached a similar conclusion in *People v. Newton*,[56] under a statute virtually identical to § 28-922(1)(a),[57] noting that Colorado courts "have concluded that a defendant's attempt to conceal an item is sufficient to establish the defendant's belief that an official proceeding was about to be instituted."[58] The court elaborated that "a defendant could believe, without certainty, that an official proceeding is about to be instituted even if the police have not contacted him."[59] The defendant in *Newton* had shot the decedent before fleeing the scene and burying his gun because "he 'didn't want to get caught.'"[60] The court found

---

[52] *Id.*

[53] *Burdell v. Com.*, 990 S.W.2d 628, 633 (Ky. 1999).

[54] *Phillips v. Com., supra* note 51, 17 S.W.3d at 876.

[55] *Id.*

[56] *People v. Newton*, 517 P.3d 79 (Colo. App. 2022).

[57] See Colo. Rev. Stat. Ann. § 18-8-610(1)(a).

[58] *People v. Newton, supra* note 56, 517 P.3d at 86.

[59] *Id.*

[60] *Id.* at 82.

that burying the gun because he did not want to get caught was sufficient to show that the defendant "knew . . . his killing of [the decedent] could trigger an official proceeding" and for a jury to conclude that an official proceeding was "'about to be instituted.'"[61]

[31] We agree with these courts that a defendant's disposal, removal, or concealment of physical evidence in order not to get "caught" by law enforcement is sufficient evidence of the defendant's "'belie[f] that an official proceeding [was] pending or about to be instituted'" at the time he or she disposed of, removed, or concealed the evidence.[62] In the instant case, the jury could have easily inferred from the evidence that Scott believed he would be prosecuted for Allen's murder when he removed and concealed physical evidence linking him to Allen's death.

Scott testified he was "freaking out" and "panicking" when he removed from Allen's house her cell phone, the bullet casing, and her body. He also removed the bullet holes by repairing them. After Scott received a phone call from law enforcement about Allen, Scott "was scared" and purchased a plane ticket to Cancun for that same day. While at the airport, Scott threw away, and thus concealed, the bullet casing and the firearm he claims to have been Allen's. He had already concealed Allen's body. After arriving in Cancun, Scott made internet searches about Allen, extradition, and avoiding law enforcement in Belize, which further indicated Scott believed he would be prosecuted in the United States for Allen's murder.

Regardless of when Scott's arrest warrant was issued, there was sufficient circumstantial evidence for the jury to infer that Scott "believ[ed] that an official proceeding was pending or about to be instituted," as contemplated in § 28-922(1), at the time he removed and concealed the physical evidence.

---

[61] *Id.* at 86.

[62] *Id*. See, also, *State v. Foreshaw, supra* note 47.

## VI. CONCLUSION

The district court did not err in denying Scott's motion to suppress the evidence seized by the Belizean police. Also, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Scott had the requisite intent to convict him of first degree murder, use of a deadly weapon (firearm) to commit a felony, and tampering with physical evidence. We find no merit to Scott's challenge of the sufficiency of the evidence, and we affirm his convictions and sentences.

Affirmed.