An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-153

Filed 20 August 2025

Craven County, Nos. 19CRS053427-240, 19CRS053428-240, 19CRS053429-240, 20CRS000589-240, 22CRS000571-240

STATE OF NORTH CAROLINA

v.

SAMAN TAMBURRO REAVES.

Appeal by Defendant from Judgments entered 12 July 2023 by Judge Bob R. Cherry in Craven County Superior Court. Heard in the Court of Appeals 16 January 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Haley A. Cooper, for the State.*

*John W. Moss for Defendant-Appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

Saman Tamburro Reaves (Defendant) appeals from Judgments entered 12 July 2023 after pleading guilty to Cruelty to Animals, Dog Fighting, Restraining Dogs in a Cruel Manner, Trafficking in Heroin by Possession, Possession of

Methamphetamine, Possession of Methylenedioxymethamphetamine (MDMA), Possession of a Firearm by a Felon, Possession of a Stolen Firearm, and Habitual Felon Status. The Record before us tends to reflect the following:

Early on 16 October 2019, "[a] passerby" reported to the New Bern County Police Department they had heard a "verbal disturbance" coming from a home on the block, and "it sounded like items were being thrown around." Officer Jeff Weaver was dispatched to investigate. Officer Weaver parked his vehicle "about a house away" and made his initial approach alone. Officer Weaver observed two access points to the residence: the front door and a side door. He "determined at the time that the best approach to begin with would be to the side and not directly at the front door[,]" so he approached a window located on the side of the residence, between the front and side doors. The window had an air-conditioning unit installed in it. At the window, Officer Weaver heard "male voices" and smelled "the strong odor of marijuana." Hearing no disturbance, Officer Weaver "felt safe enough to approach the front door."

There was a dog lying in front of the door, so Officer Weaver "went back around to the window and knocked on it, yelled, 'police,' " and asked if someone could come to the front door. An unidentified individual opened the door and stepped outside. According to Officer Weaver, the individual "opened [the door] just far enough to slide out the door, then he pulled it closed behind him real quick." Officer Weaver, standing in the front yard below the steps, "got hit in the face with the odor of

marijuana again." The individual allegedly "said he would put the dog up and come right back, and then he walked off with the dog, around the house."

The individual did not come back. Officer Weaver walked along the side of the house, now accompanied by a back-up officer, and observed the shoes the individual had been wearing left in the grass but no other sign of the individual or the dog. The officers walked back to the front door and knocked again. This time, Aaron Inman answered the door. Officer Weaver smelled marijuana again. The officers spoke to Inman who confirmed there had been a dispute in the house but "everything was fine[.]"

The officers left the residence. Officer Weaver subsequently obtained a search warrant for the residence "based off the odor of marijuana and the behavior [he had witnessed]." Officer Weaver, along with a "tactical team" of officers, executed the warrant the following day; Officer Weaver breached the door and the rest of the officers began to search the residence, seizing heroin, methamphetamine, MDMA, wallets containing "a significant amount of cash," cell phones, and two firearms. Officer Weaver was later brought out to the backyard, where officers had seized multiple dogs found on the property. Various medications for the dogs and a treadmill were also seized from inside the residence.

On 2 March 2020, Defendant was indicted for Cruelty to Animals, Dog Fighting, and Restraining Dogs in a Cruel Manner. On 3 August 2020, Defendant was indicted for Trafficking in Heroin by Possession, Possession of

Methamphetamine, Possession of MDMA, Possession of a Firearm by a Felon, and Possession of a Stolen Firearm. Lastly, on 8 August 2020, Defendant was indicted as a Habitual Felon.

On 27 February 2023, Defendant filed a Motion to Suppress all evidence on the basis the search warrant was overbroad and not particularized to the probable cause affidavit. On 28 February 2023, Defendant filed an Addendum to suppress the contents of his cell phone, arguing his phone should not have been searched without a separate warrant. On 3 July 2023, Defendant filed a second Motion to Suppress, arguing probable cause for the warrant was obtained through unconstitutionally seized evidence.

At the hearing on the Motions, Defendant explained he did not live in the residence full-time, but he had been "renting a room" in the two-bedroom home because of tensions with the mother of his child. However, he did not have a designated room, and as many as seven people could be "passing through" at any point. Defendant also explained the residence was primarily used to house dogs: other individuals "had their dogs there" or "would pay to house their dog in [the] yard." Defendant testified he had "paid for [his] dogs to be there before [he] even decided to even get a room." The cost to keep a dog on the property was "$25 or $30[.]" According to Defendant, there were "several kennels" in the yard, two of which belonged to him, and he had one dog on the property when the officers executed the search warrant. When questioned as to why he had two kennels with only one dog,

Defendant stated he "had other dogs" and also had been planning to "do a breeding[.]" Papers from the "American Dog Breeders Association," which Defendant confirmed were for his dog, were found under a mattress in a bedroom during the search.

At the conclusion of the hearing, the trial court denied both Motions. The trial court denied the 3 July 2023 Motion based on a conclusion Officer Weaver did not exceed the lawful scope of a knock and talk and because the smell of marijuana at the front door created probable cause for the warrant—independent of the smell of marijuana at the side window. The trial court denied the 27 February 2023 Motion on the bases the warrant was not overbroad, Defendant's cell phone was lawfully searched pursuant to the warrant, and the dog fighting evidence was lawfully seized from plain view. The trial court entered its written Orders on 1 September 2023.

Defendant pleaded guilty to all charges in exchange for the State applying Defendant's habitual felon status to only five of the eight other charges. Defendant also reserved his right to appeal the denial of his Motions to Suppress. The trial court entered Judgments in accordance with the pleas on 12 July 2023. Defendant gave oral Notice of Appeal in open court.

## Issues

The issues on appeal are whether the trial court properly denied: (I) Defendant's 3 July 2023 Motion to Suppress; and (II) Defendant's 27 February 2023 Motion to Suppress on the bases (A) the warrant was not overbroad, (B) a second

warrant was not required to search the contents of Defendant's cell phone, and (C) the dog fighting evidence was lawfully seized from plain view.

## Analysis

"Our review of a trial court's denial of a motion to suppress is strictly limited to a determination of whether [the trial court's] findings are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion." *State v. Reynolds*, 161 N.C. App. 144, 146-47, 587 S.E.2d 456, 458 (2003) (citation and quotation marks omitted). "Unchallenged findings of fact are binding on appeal." *State v. Byrd*, 287 N.C. App. 276, 279, 882 S.E.2d 438, 440 (2022) (citation omitted). "We review the trial court's conclusions of law de novo." *Id.* (citation omitted). Whether the trial court describes its conclusions as findings of fact or conclusions of law makes no difference to our review: "We will review conclusions of law *de novo* regardless of the label applied by the trial court." *State v. Jackson*, 220 N.C. App. 1, 8, 727 S.E.2d 322, 329 (2012) (citation and quotation marks omitted).

I.     3 July 2023 Motion to Suppress

Defendant argues the trial court erred in denying his 3 July 2023 Motion to Suppress. Specifically, Defendant argues Officer Weaver's initial approach to the side window exceeded the lawful scope of a knock and talk, and thus the trial court's Findings do not support its Conclusion Officer Weaver did not exceed the permissible scope of a knock and talk. The State argues Officer Weaver's actions were lawful under the "community caretaker doctrine." We disagree with the State's rationale

but nonetheless conclude the trial court did not err in concluding Officer Weaver acted within the permissible scope of a knock and talk.

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' " *Florida v. Jardines*, 569 U.S. 1, 5, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d. 495 (2013) (quoting U.S. Const. amend. IV); *see also State v. Weaver*, 231 N.C. App. 473, 480, 752 S.E.2d 240, 244 (2013) ("The fourth amendment as applied to the states through the fourteenth amendment protects citizens from unlawful searches and seizures committed by the government or its agents." (citation and quotation marks omitted)). "To give full practical effect to that right, the Court considers curtilage—the area immediately surrounding and associated with the home—to be part of the home itself for Fourth Amendment purposes." *Collins v. Virginia*, 584 U.S. 586, 592, 138 S. Ct. 1663, 1670, 201 L. Ed. 2d 9 (2018) (quotation marks omitted) (citing *Jardines*, 569 U.S. at 6, 133 S. Ct. at 1414).

"In North Carolina, however, no search of the curtilage occurs when an officer is in a place where the public is allowed to be, such as at the front door of a house." *State v. Lupek*, 214 N.C. App. 146, 151, 712 S.E.2d 915, 919 (2011). This sort of interaction has come to be known as a "knock and talk." *See, e.g.*, *State v. Marrero*, 248 N.C. App. 787, 790, 789 S.E.2d 560, 564 (2016) ("A 'knock and talk' is a procedure by which police officers approach a residence and knock on the door to question the

occupant, often in an attempt to gain consent to search when no probable cause exists to obtain a warrant." (citation omitted)). "If law enforcement goes beyond the bounds of a knock and talk and, in so doing, sees or smells contraband, then, absent an applicable exception to the warrant requirement, they do not have the right to seize that evidence." *State v. Falls*, 275 N.C. App. 239, 249, 853 S.E.2d 227, 235 (2020) (citing *Collins*, 584 U.S. at 595, 138 S. Ct. at 1672).

We adopted "community caretaking" as an exception to the warrant requirement in *State v. Smathers*, 232 N.C. App. 120, 128-29, 753 S.E.2d 380, 386 (2014). "Under this test, . . . the State has the burden of proving that: (1) a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, that under the totality of the circumstances an objectively reasonable basis for a community caretaking function is shown; and (3) if so, that the public need or interest outweighs the intrusion upon the privacy of the individual." *Id.* (citations omitted). The exception generally applies when there is an apparent public emergency. *See, e.g.*, *id.* (officer witnessed vehicle run into a large animal); *State v. Sawyers*, 247 N.C. App. 852, 860-61, 786 S.E.2d 753, 758 (2016) (officer observed the defendant "and what appeared to be a homeless male dragging a female who seemed to 'either be very intoxicated or drugged' " into a vehicle).

Here, Officer Weaver approached the residence to determine *whether* there was an ongoing emergency, not in response to one that was almost certain. "Thus, this situation is unlike one in which the facts point unquestionably to some public

emergency, such as a door that has been broken open, or signs that someone inside the home needs emergency medical attention." *State v. Huddy*, 253 N.C. App. 148, 154, 799 S.E.2d 650, 655-56 (2017).

Still, we conclude the trial court did not err in concluding Officer Weaver acted within the permissible scope of a knock and talk. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio*, 392 U.S. 1, 23, 88 S. Ct. 1868, 1881, 20 L. Ed. 2d 889 (1968). The Supreme Court of the United States in *Pennsylvania v. Mimms* noted officer safety is "both legitimate and weighty." 434 U.S. 106, 110, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331 (1977).

> The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.

*Id.* at 108-09, 98 S. Ct. at 332 (internal citations and quotation marks omitted).

Here, the evidence tends to show Officer Weaver was following prudent procedures motivated by legitimate safety concerns. *See Rodriguez v. United States*, 575 U.S. 348, 372, 135 S. Ct. 1609, 1625, 191 L. Ed. 2d 492 (2015) (Alito, J., dissenting). The only information available to Officer Weaver on his initial approach to the residence was that someone had heard "a verbal disturbance" and it had "sounded like items were being thrown around." Moreover, Officer Weaver was alone

on his initial approach, without backup. Thus, Officer Weaver had reason to believe entering the curtilage first would be safer than immediately knocking on the front door. *See State v. Gentile,* 237 N.C. App. 304, 309, 766 S.E.2d 349, 353 (2014) (entry into curtilage violates Fourth Amendment only "where officers have no reason to believe that entering a homeowner's curtilage will produce a different response than knocking on the residence's front door" (citation omitted)). Indeed, Officer Weaver testified he tailored his response to the "worst case scenario until" he had reason to believe there was no imminent danger. Accordingly, the trial court found:

> (7) Weaver, on both direct and cross examination, explained in great detail why, on October 16, 2019, he first approached the side window of the Residence instead of the front door:
>
>> A. initially, he was the only responding law enforcement officer on scene, and
>>
>> B. the nature of the report of a disturbance, which could have been a domestic disturbance, through his training and experience dictated, for purposes of officer safety, that he obtain as much information regarding persons in the Residence, that he could obtain from both the front and unobstructed side of the Residence, before making contact at the front door, and
>>
>> C. he made the decision to park his patrol car down the road, a couple houses away, and approached the Residence from the side of the house.
>
> (8) . . . the side window that Weaver first visited was more easily accessible from where he parked his patrol vehicle than the front door, the side window was not protected by a fence or other structure and was certainly not located around the back of the house.

(9) Weaver testified that when he visited the side window (which contained a window [unit] style air conditioner), he smelled what he determined was an odor of marijuana, he heard male voices, and decided to proceed to the front door to make initial contact but was met by an unleashed dog lying in front of the front door on the small porch.

(10) Weaver testified that he was bitten by a dog before, and for his safety, he returned to the side window to announce his presence and request that one of the occupants meet him at the front door due to the presence of the untethered dog.

(11) . . . even if Weaver had first approached the Residence via the front door, that he would have visited the side window to announce his presence once he discovered the untethered dog on the porch in front of the front door.

These unchallenged Findings support the trial court's Conclusion Officer Weaver was at all relevant times in a place where he had a right to be.

Furthermore, even if Officer Weaver's first perception of marijuana at the side window was the result of an unconstitutional search, "the dispositive question is whether the search warrant in the case *sub judice* was based on, or prompted by, information obtained from the officers' warrantless entry, or . . . based on information acquired independently of the warrantless entry so as to purge the search warrant of the primary taint." *State v. Robinson*, 148 N.C. App. 422, 430, 560 S.E.2d 154, 160 (2002). Here, the trial court concluded the smell of marijuana at the front door created independent probable cause to support the warrant.[1] In support of this

---

[1] In its Order denying Defendant's 3 July 2023 Motion to Suppress, the trial court found "the opening of the front door was occasioned not once, but twice, with the strong odor of marijuana, thus

Conclusion, the trial court found "the opening of the front door was occasioned not once, but twice, with the strong odor of marijuana[.]" This Finding is unchallenged by Defendant and, thus, binding on appeal. *See Byrd*, 287 N.C. App. at 279, 882 S.E.2d at 440.

Defendant argues this Conclusion conflicts with our holding in *State v. Falls*. There, this Court reversed the trial court's denial of a motion to suppress because the officers "lacked a warrant supported by probable cause and no other exception to the Fourth Amendment's warrant requirement applied[.]" 275 N.C. App. at 254-55, 853 S.E.2d at 238. The officers in *Falls*, approaching the defendant's home for a knock and talk, saw the defendant getting into his car and "cut into [the defendant's] front yard and between the trees to go straight to the vehicle." *Id.* at 240-41, 853 S.E.2d at 230 (quotation marks omitted). The officers approached the car as it was reversing out of the driveway; they observed a firearm in plain view and smelled marijuana emanating from the driver's side of the vehicle. *Id.* at 241. Based on this interaction, the officers obtained a search warrant for the home, upon execution of which they recovered additional evidence of illegal activity. *Id.* Thus, probable cause for the

---

the probable cause for the search warrant was based not just from such odor emanating from a side window of the house, nor from the first person to exit the Residence via the front door, but from inside the Residence itself twice, via front door." This statement is a mixed determination of fact and law— the latter half of the "finding" is more properly regarded as a conclusion of law and, thus, we review it as such. *See Jackson*, 220 N.C. App. at 8, 727 S.E.2d at 329; *State v. Gerard*, 249 N.C. App. 500, 505, 790 S.E.2d 592, 595 (2016) (reviewing probable cause determination as conclusion of law, despite trial court's label as finding of fact).

warrant to search the home in *Falls* was based solely on the unconstitutional search of the vehicle. *See id.*

Here, by contrast, the trial court concluded the warrant was supported by probable cause created by the smell of marijuana at the front door as well as the side window. Thus, even if Officer Weaver's perception of marijuana at the side window was the product of an unconstitutional search, the search warrant was supported by independent grounds for probable cause: the smell of marijuana at the front door. *See State v. Corrothers*, 295 N.C. App. 192, 200, 905 S.E.2d 237, 244 (2024) ("It is plain that the affidavit attached to the initial search warrant application provides abundant support for the issuance of a search warrant, even absent an allegation regarding [law enforcement's] observation of [evidence from the curtilage]."). Therefore, the trial court's Findings support its Conclusion the search warrant was supported by probable cause "based upon observations that were lawful[.]" Consequently, the trial court properly denied Defendant's 3 July 2023 Motion to Suppress.[2]

II.     27 February 2023 Motion to Suppress

---

[2] Because we conclude the trial court properly determined the search warrant was supported by probable cause, we do not address Defendant's arguments as to whether he has Fourth Amendment standing to challenge the search. *See State v. Mlo*, 335 N.C. 353, 377, 440 S.E.2d 98, 110 (1994), *cert. denied*, 512 U.S. 1224, 114 S. Ct. 2716, 129 L. Ed. 2d 841 (1994) ("A person's right to be free from unreasonable searches and seizures is a personal right, and *only those persons whose rights have been infringed* may assert the protection of the Fourth Amendment." (emphasis added) (citations omitted)).

In his 27 February 2023 Motion to Suppress and accompanying Addendum, Defendant raises three separate arguments related to the search warrant. He contends: (A) the warrant was overbroad, (B) a second warrant was required in order to search the contents of his cell phone, and (C) the dog fighting evidence was unlawfully seized. We address each argument in turn.

A. *Scope of Warrant*

Defendant argues the search warrant was overbroad and allowed officers to search for evidence of a crime for which they did not have probable cause. Specifically, Defendant contends the warrant permitted the officers to seize evidence of trafficking, when the probable cause affidavit only alleged possession of a controlled substance.

"[T]he scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S. Ct. 1013, 1016, 94 L. Ed. 2d 72 (1987) (citation and quotation marks omitted). Stated differently, probable cause "means a reasonable ground to believe that the proposed search will reveal the presence upon the premises to be searched of the objects sought and that those objects will aid in the apprehension or conviction of the offender." *State v. Campbell*, 282 N.C. 125, 128-29, 191 S.E.2d 752, 755 (1972) (citation omitted). The probable cause affidavit supporting a search warrant "must establish a nexus between the objects sought and the place to be searched." *State v. Eddings*, 280 N.C. App. 204, 210, 866 S.E.2d 499, 504 (2021)

(alteration, citation, and quotation marks omitted); *see also* N.C. Gen. Stat. § 15A-244(3) (2023) (an application for a search warrant must "particularly [set] forth the facts and circumstances establishing probable cause to believe that the items are in the places . . . to be searched").

Here, the application for the warrant was based on suspected possession of marijuana. At the hearing on the Motions to Suppress, Officer Weaver testified the list of items to be seized was created based on "things that are commonly found with marijuana":

> [Defense Counsel]: Is this a form type list of items to be seized that your department uses?
>
> . . . .
>
> [Officer Weaver]: No, it is not a standardized state form or agency form.
>
> [Defense Counsel]: Okay. So you went down and filled out each one of these paragraphs of property to be seized from paragraph 1 to paragraph 12?
>
> [Officer Weaver]: Yes, sir.
>
> [Defense Counsel]: In each one of these paragraphs, the property to be seized was based off your probable cause because of the smell of marijuana?
>
> [Officer Weaver]: It -- it's a generalized list of what's associated property to be seized, a list of things that are commonly found with marijuana, yes, sir.
>
> [Defense Counsel]: Okay.

[Officer Weaver]: Or the illegal, illicit activities surrounding marijuana.

Although the probable cause affidavit only specified the crime as possession of a controlled substance, Officer Weaver alleged activity related to trafficking in the affidavit itself and explained the nexus to the items sought:

> Applicant in this matter knows through previous investigations that users and *sellers of controlled substances* will often utilize other person's property to *conduct day to day business* to limit their exposure to law enforcement and conceal their identities. Applicant in this matter also knows that users and *sellers of controlled substances* also maintain a supply or "stash" of narcotics and or U.S. currency secreted in nearby locations both when *conducting business* at third party locations and when on their own property to limit exposure to arrest and seizure of funds by law enforcement and from *rival competition*. It is further known that individuals involved in the use *and sale of controlled substances* often possess firearms to protect themselves from robbery and violence from *rival competition and customers*.

(emphasis added). Thus, the probable cause affidavit alleged grounds to believe Defendant was involved in the sale and distribution of marijuana.

The trial court concluded: "The search warrant itself was not overbroad, but authorized the search for evidence of the transportation, ordering, purchase and distribution of controlled substances, particularly marijuana." In support of this Conclusion, the trial court found "the opening of the front door was occasioned not once, but twice, with the strong odor of marijuana[.]" Therefore, the trial court's Findings support its Conclusion the warrant was not overbroad because it authorized the search for evidence of transportation, ordering, purchase, and distribution of

marijuana. Consequently, the trial court properly denied Defendant's Motion to Suppress on the grounds the warrant was not overbroad.

B. *Cell Phone Search*

Next, Defendant argues the trial court erred in denying his Motion to Suppress evidence obtained from his cell phone. Defendant contends the contents of his cell phone should not have been searched without a separate warrant.

Defendant cites no authority—and we know of none—for his argument a cell phone seized pursuant to a valid warrant cannot be lawfully searched. Rather, Defendant cites *Riley v. California*, wherein the Supreme Court of the United States held, absent exigent circumstances, law enforcement must generally secure a warrant before searching a cell phone seized incident to arrest. 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). We applied this principle in *State v. Ladd*, 246 N.C. App. 295, 303-04, 782 S.E.2d 397, 402-03 (2016) (applying *Riley* in holding a warrant was required to search external hard drives). Here, by contrast, Defendant's cell phone was seized pursuant to a valid warrant—which listed "media that has the ability to store and process electronic data" as property to be seized. Thus, Defendant's cell phone was lawfully searched pursuant to the warrant. Therefore, the trial court properly denied Defendant's Motion to Suppress the contents of his cell phone.

C. *Seizure of Evidence in Plain View*

Lastly, Defendant argues the evidence relating to the dog fighting and animal cruelty charges was not lawfully seized. Defendant contends Finding of Fact 14, the sole Finding related to this evidence, is not supported by competent evidence. We agree with Defendant that Finding 14 is not wholly supported by the evidence but nonetheless conclude the trial court did not err in concluding the evidence was lawfully seized.

The trial court concluded the dog fighting evidence was lawfully seized from plain view. "Under the plain view doctrine, a warrantless seizure is lawful if (1) the officer views the evidence from a place where he has a legal right to be, (2) it is immediately apparent that the items observed constitute evidence of a crime, are contraband, or are subject to seizure based upon probable cause, and (3) the officer has a lawful right of access to the evidence itself." *State v. Alexander*, 233 N.C. App. 50, 55, 755 S.E.2d 82, 87 (2014) (citation omitted).

Defendant challenges only the second element: whether it was immediately apparent to Officer Weaver the items seized were evidence of a crime. "The term 'immediately apparent' in a plain view analysis is satisfied only if the police have probable cause to believe that what they have come upon is evidence of criminal conduct." *State v. Graves*, 135 N.C. App. 216, 219, 519 S.E.2d 770, 772 (1999) (citation and quotation marks omitted).

In support of its Conclusion, the trial court found:

> (14) Weaver testified that upon entering the Residence to execute the search warrant, he immediately viewed evidence in plain view that, [through] his training and experience, he knew was associated with the crime of dog fighting, including a dog "treadmill" and other such evidence.

Contrary to the trial court's Finding, Officer Weaver did not testify he knew the treadmill and other items were evidence of dog fighting through his training and experience. Rather, Officer Weaver testified, "I had initially seen a -- or observed a -- what I was *later to be told* was a treadmill for dogs, which is commonly used to build up cardio endurance for dogs." (emphasis added). It is true, Officer Weaver testified he saw the treadmill in plain view, but to the extent the Finding states Officer Weaver immediately knew through his training and experience it was evidence of dog fighting, it is unsupported by the evidence.

However, as the State argues, there was evidence to support a Finding the dog fighting evidence was lawfully seized from plain view based on the officers' collective knowledge. An officer may effect a search or arrest without personal knowledge of probable cause if "the various officers who participate in [the] investigation and arrest have the probable cause information between them." *State v. Coffey*, 65 N.C. App. 751, 756-57, 310 S.E.2d 123, 127 (1984). "Stated another way, 'when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.'" *State v. Bowman*, 193 N.C. App. 104, 109, 666 S.E.2d

831, 835 (2008) (quoting *United States v. Laughman*, 618 F.2d 1067, 1072 n.3 (4th Cir. 1980), *cert. denied*, 447 U.S. 925, 100 S. Ct. 3018, 65 L. Ed. 2d 1117 (1980)). This principle has been applied in varying contexts, including searches and seizures. *See, e.g.*, *id.* (warrantless search of vehicle by officer with no personal knowledge of the defendant's illegal activity); *United States v. Wells*, 98 F.3d 808 (4th Cir. 1996) (seizure of firearm by officer who had no personal knowledge the defendant was a convicted felon); *State v. Gray*, 55 N.C. App. 568, 286 S.E.2d 357 (1982) (stop of vehicle for expired license tags by officer who did not personally observe the tags).

Here, in the course of their search, the officers discovered dogs restrained in the yard, medications for the dogs, pedigree papers for at least one of the dogs, and a dog treadmill—all in plain view. Although Officer Weaver may not have personally known the treadmill was a "treadmill for dogs," that information was clearly communicated to Officer Weaver. Moreover, Officer Weaver testified if he hadn't searched a room "specifically," he "walked through and was shown exactly what was located." Thus, the knowledge the items were evidence of illegal activity was appropriately communicated from the tactical team to Officer Weaver such that the knowledge may be imputed to Officer Weaver. *See Coffey*, 65 N.C. App. at 756-57, 310 S.E.2d at 127. Likewise, the individual officers to whom it was apparent the items were dog fighting evidence did not need to testify at the suppression hearing because this knowledge is imputed to Officer Weaver. *See Bowman*, 193 N.C. App. at 110-11, 666 S.E.2d at 835-36 ("The fact that the officer who actually initiated the

search of the vehicle and the officer who ordered defendant's arrest did not testify at the suppression hearing is unavailing because the knowledge of [those officers] as part of the team investigating [the defendant's] illegal activity was imputed to . . . the officer who initiated the search.").

Thus, Officer Weaver and the other officers effecting the search "between them had sufficient information to reasonably justify the belief" the dogs, treadmill, and medications were evidence of criminal conduct. *See Coffey*, 65 N.C. App. at 757, 310 S.E.2d at 128; *Graves*, 135 N.C. App. at 219, 519 S.E.2d at 772. Therefore, the seizure of the dog fighting evidence was proper under the plain view doctrine. Consequently, the trial court properly denied Defendant's Motion to Suppress the dog fighting evidence.

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm the Judgments of the trial court.

AFFIRMED.

Judges GORE and FREEMAN concur.

Report per Rule 30(e).