IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. RODRIGUEZ-PADRON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CARLOS RODRIGUEZ-PADRON, APPELLANT.

Filed December 9, 2025.    No. A-24-953.

Appeal from the District Court for Hall County: ANDREW C. BUTLER, Judge. Affirmed.

Katheryn L. Harouff, of Harouff Law, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

### INTRODUCTION

Carlos Rodriguez-Padron appeals from his convictions in the district court for Hall County of theft by unlawful taking and criminal mischief. On appeal, he assigns error to the admission of certain evidence, the sufficiency of the evidence to support his convictions, and the sentences imposed by the court. He also assigns that he received ineffective assistance of trial counsel. Finding no error, we affirm.

### STATEMENT OF FACTS

Rodriguez-Padron was charged with theft by unlawful taking, $1,500 to $5,000, a Class IV felony, and criminal mischief, $1,500 to $5,000, a Class I misdemeanor. See, Neb. Rev. Stat. § 28-511(1) (Reissue 2016); Neb. Rev. Stat. § 28-518(2) (2024 Cum. Supp.); Neb. Rev. Stat. § 28-519(3) (Reissue 2016). The charges arose from a series of diesel fuel thefts at a particular gas station in Grand Island, Nebraska, in February and March 2024.

- 1 -

One of the witnesses endorsed by the State prior to trial was Jennifer Pavlik, who was the manager of the gas station at the time of the diesel thefts. On July 31, 2024, the district court heard a motion by the State to endorse Katelyn Barnes as a witness. At that time, the prosecutor informed the court that when calling witnesses for trial, he learned that Pavlik had recently died. The prosecutor stated that Barnes was the interim manager of the gas station, and he told the court that the State intended to use Barnes to provide foundational evidence for the business' losses. Rodriguez-Padron's attorney objected to the motion, stating "from our knowledge" Barnes was not present on the dates and times of the incidents in question. He also acknowledged that while the introduction of business records would not be hearsay, he expressed the concern that "any additional testimony that might be made purposefully or accidentally . . . would be hearsay or would further prejudice the jury." Rodriguez-Padron's attorney made further comments, but he did not claim any prejudice in preparing for Barnes as a witness. The court observed that the issues raised by Rodriguez-Padron could be addressed at trial, and it granted the State's motion.

A jury trial was held on August 13-15, 2024. The court received exhibits, including various documents and photographs and security camera footage from the gas station. The State presented testimony from police officers who investigated the diesel thefts, Barnes, and a service technician. Rodriguez-Padron testified on his own behalf.

Officer Wendy Baker of the Grand Island Police Department was called to the gas station on March 12, 2024, to take a report of diesel fuel thefts occurring between February 27 and March 10. Baker spoke to the manager, Pavlik, who reported that a man had shown up at the gas station approximately seven times and had filled up a tank in the bed of his pickup with diesel fuel. Pavlik reported that the man would fill the tank by "put[ting] one pump through the window of the back topper into the tank, and then us[ing] the other pump on the other side the same way" without paying for all the fuel he dispensed. Baker was called back to the gas station on March 15, when the man was again observed at the pumps, at which time he was identified as Rodriguez-Padron.

During Baker's first visit, Pavlik provided surveillance video of the person suspected of dispensing more diesel fuel than was prepaid for on several dates from February 27, 2024, to March 10 at the gas station. The surveillance video was received into evidence at trial as exhibit 30. Exhibit 30 contains footage from multiple camera angles both inside and outside the store, from the incidents depicted. Baker reviewed a portion of one of the video clips during her trial testimony and identified the person shown as Rodriguez-Padron. And, during his trial testimony, Rodriguez-Padron agreed that he is the person depicted in exhibit 30. With some variations, the incidents depicted in exhibit 30 generally reflect a pattern of Rodriguez-Padron pulling a pickup into the bay for pump 14, getting out and crouching behind pump 15 briefly, before getting back in and moving the pickup to the bay for pump 15. He then activates pump 15 either by prepaying inside with cash or with a card at the pump, and he pumps fuel into a tank in the bed of the pickup, before moving the pickup back to the bay for pump 14, where he again crouches behind pump 15 briefly before returning to the pickup and leaving the gas station. During one of the incidents depicted, Rodriguez-Padron drove a white pickup, instead of a black pickup with a topper. And there is footage depicting a vehicle owned by his then-girlfriend pulling into the pump 14 bay to block Rodriguez-Padron's actions behind pump 15; during the incidents when the girlfriend participated, Rodriguez-Padron pulled into the bay for pump 15 and did not move his own vehicle multiple times.

Pavlik also provided Baker with a summarization of the gas station's calculated losses of diesel fuel up to the time of Baker's first visit. The State offered this summarization as exhibit 1 during Baker's testimony, but the district court sustained Rodriguez-Padron's hearsay objection at that point. Barnes testified further about exhibit 1. At the time of the diesel thefts, Barnes was the assistant manager of the gas station, working under Pavlik as her manager. By trial, Pavlik had died, and Barnes was the manager. Barnes testified that in early March 2024, she became aware of an issue with the gas station's diesel fuel supply being "off more than it usually should have been." She explained that the gas station completes a fuel report every day, calculating the gallons of diesel fuel the gas station has at the start of the day and indicating how much fuel was dispensed during a 24-hour period. The amount of fuel dispensed is then compared with the amount of fuel sold, and the gas station notes significant discrepancies. Barnes' job duties at the time of the thefts included reviewing that documentation. According to Barnes, the gas station's records for early March indicated that there were multiple days when the gas station was short by "hundreds of gallons" of diesel fuel.

As a manager, Barnes' job duties include cataloging, summarizing, and maintaining documentation of any "potential exorbitant losses" she "might notice on [the gas station's] books." Barnes indicated that she was trained in these duties by Pavlik and Pavlik would have had similar training in her job as manager. Barnes confirmed that such documentation was maintained with respect to the losses at issue. Barnes testified that she was involved in assessing the information included in exhibit 1, which had been prepared by Pavlik as part of the gas station's maintenance of business records documenting alleged diesel fuel losses. According to Barnes, the gas station routinely maintains this type of document to track such incidents of loss. Barnes testified that she was trained to create and maintain this documentation as a business record of the gas station in the event of a theft and confirmed that "to the best of [her] knowledge, that was the process followed" in creating exhibit 1. The State offered exhibit 1 again at this point in Barnes' testimony, and the district court received it over Rodriguez-Padron's hearsay and foundation objections. Exhibit 1 reflects the gas station's diesel fuel losses for February 27 and 28, 2024, and March 2, 4, 7, 8, and 10, and it shows a total loss through March 10 of $4,402.26.

Exhibits 3-7 are cash register journals documenting the date and time of the prepayment transaction for five of the diesel fuel thefts (February 27 and 28, 2024, and March 4, 7, and 8). According to Barnes, these journals are created by the gas station's computer system in the ordinary course of business. These exhibits show a prepayment with cash inside the store for diesel on pump 15 for each represented fuel transaction, except the incident on March 7, 2024, which shows a credit card payment at the pump.

There are certain handwritten notations on exhibits 3-7. Barnes testified, without objection, that the handwriting on these exhibits was Pavlik's, and she indicated that Pavlik's notations included short descriptions of each transaction made after Pavlik reviewed the associated video surveillance footage. Pavlik's handwritten notes on exhibit 3, the cash register journal for the February 27, 2024, transaction, state "white 4dr truck w/ Intransits" and "pulled up@ 20:31:55 in white duely [sic] 4door." Exhibit 4 (February 28 transaction) states "21:30:44" and "Black truck"; exhibit 5 (March 4) states "pulled up to pump," "19:33," "Blue Hoodie," "grey shorts," and "Black truck"; exhibit 6 (March 7) states "pulls up @ 10:26:31"; and exhibit 7 (March 8) states "pulled up @ 20:06:32." Barnes testified that the gas station's managers are trained to review available

security footage and to document on the register journals that the transaction in the journal is associated with the transaction that was viewed on the security footage and that Pavlik was trained in this process. Based on Barnes' review of the notations on exhibits 3-7, Barnes testified that Pavlik had followed this process in making the notations.

Rodriguez-Padron made hearsay objections to the offer of exhibits 3-7; his attorney specifically asserted that the handwriting on these exhibits was outside of the business records exception. The district court received exhibits 3-7 over Rodriguez-Padron's objections.

On March 15, 2024, Investigator Bryce Collamore responded to a dispatch call reporting that an individual was stealing fuel from the pumps at the gas station. Dispatch advised that this individual was suspected of being involved in several other large-quantity diesel fuel thefts. Upon arriving at the gas station, Collamore saw a black Chevrolet Silverado pickup at the diesel pumps. The pickup, which was "a gasoline truck, not a diesel truck," had a topper that did not fit properly and extended past the end of the pickup bed. Collamore saw a man standing outside the pickup and pumping fuel, which appeared to be going through a window in the topper on the driver's side and into the pickup bed. Collamore also observed the hose from a satellite pump going into the topper on the passenger side. Collamore pulled in behind the pickup and activated his "in-visor" lights. He contacted the man and identified him as Rodriguez-Padron. Based on the information Collamore received from dispatch and his own observations, he detained Rodriguez-Padron and turned him over to another officer who had just arrived.

Pump 15, where Rodriguez-Padron's pickup was located, is a "high-flow fuel pump," with a main pump and a satellite pump on the opposite side of the vehicle bay to allow "diesel trucks, like semis," to pump fuel on both sides at the same time. When drivers activate the main pump, they can also dispense fuel from the satellite pump. The satellite pump does not have a screen or a place to insert a credit or debit card; it is "just an extra nozzle to help from the other side."

After Rodriguez-Padron was detained, Collamore spoke briefly with a gas station attendant, who advised that Rodriguez-Padron had prepaid $80 in cash for pump 15. Collamore then proceeded to examine the pickup more closely. Upon opening the topper windows, Collamore observed a large 250 gallon tank in the back of the pickup with an "access cap" on each side. Various photographs depicting the pickup and its contents were received at trial. Pieces of plywood, partially painted black, were placed in the pickup bed in an apparent attempt to cover the topper windows and prevent anyone from seeing what was in the bed of the pickup. Collamore observed that the 250 gallon capacity tank in the pickup bed was filled to "above the 900-liter mark," which Collamore testified was around 237 gallons. On the bottom of the pickup bed at the base of the tank, Collamore observed a fuel line, "similar to what would be at any gas station," and a 12 volt pump, "to pump the fuel out of the tank through that hose into some other . . . vehicle or other tank." Upon searching the rest of the pickup, Collamore observed paperwork in the glovebox showing that Rodriguez-Padron had recently purchased the pickup. In the driver's door compartment, Collamore located a folding knife; the blade was "bent pretty decently" and the tip of the blade was broken off, which indicated to Collamore that it might have been used "to pry something."

Collamore was asked whether he investigated any bank records or financial transaction devices associated with Rodriguez-Padron. He testified that after March 15, 2024, he was advised that the gas station's surveillance video from March 15 showed Rodriguez-Padron had been

communicating with someone in a maroon Chevrolet Silverado truck parked in the bay next to Rodriguez-Padron's pickup. The driver of the maroon pickup had paid for gasoline with a debit card. The gas station provided Collamore with the card number associated with that transaction. Collamore subpoenaed the account information and identified the account holder, who was the owner of the maroon pickup. Rodriguez-Padron was a co-owner of the account, and his name was also on the registration for the maroon pickup.

Officer Jesse Parker testified about his role in the police investigation on March 15, 2024. When Parker arrived at the gas station, he observed Collamore handcuffing Rodriguez-Padron. Collamore then asked Parker to place Rodriguez-Padron in Parker's patrol car. Before doing so, Parker searched Rodriguez-Padron for "any contraband or any weapons." During the search, Parker located a "white plastic gear" in Rodriguez-Padron's right sweatpants pocket. The gear and several photographs depicting it were received into evidence. Parker returned to the gas station later that day to meet with a fuel pump technician, who arrived to inspect the pumps for problems. The technician replaced the internal mechanism of pump 15, which was missing a component. His testimony, summarized below, confirms that the white gear found in Rodriguez-Padron's pocket was the missing component. Photographs of pump 15 after it was opened by the technician, both before and after the replacement, were received in evidence.

Doug DeMers is a fuel pump technician whose business has provided maintenance and service work for the gas station since it opened. DeMers estimated that he is called out to provide maintenance services for the gas station around three times per month. At trial, DeMers described that all the pumps dispensing diesel fuel at the gas station have a fuel line, or lines, connected to the same large tank of diesel. Pump 15 has both a main pump and a satellite pump with hoses on both sides of the bay, which allows large semitrucks to fill their fuel tanks on both sides of the truck at the same time. The main pump is activated when its handle is lifted to dispense fuel. This also triggers the satellite pump, which will then dispense fuel when its handle is lifted. If someone prepays for diesel on pump 15, that person could use both the main hose and the satellite hose for pump 15. When both pumps are active, pump 15 has a flow rate of around 30 gallons per minute. Accordingly, if someone paid for 20 gallons of diesel, pump 15 would dispense that amount of fuel in less than a minute.

DeMers also testified about how the pumps calculate the amount of fuel dispensed, so they can stop once a prepaid amount has been reached. A small brass wheel mechanism and optical encoder inside the pump track that calculation. The brass wheel has holes around the sides and a known rate of rotation. The holes pass through an optical encoder, which counts the revolutions to calculate the amount of fuel being dispensed. If the wheel is manipulated to turn either faster or more slowly than it should, the pump's calculation will be incorrect. A white gear connected to the brass wheel determines how quickly or slowly the wheel turns. DeMers explained that if the white gear is larger, the brass wheel turns faster; if it is smaller, the brass wheel turns more slowly. Accordingly, if the white gear is replaced by a smaller object, the brass wheel will turn more slowly, even though the pump continues dispensing fuel at the same rate. By manipulating how fast the brass wheel rotates, a person can manipulate how much fuel is dispensed. For example, if someone prepaid for $20 of fuel and manipulated the brass wheel to turn 10 times more slowly than it should, the pump machine will calculate that it has dispensed $20 of fuel but will actually dispense $200 of fuel.

In 2024, sometime prior to March 15, DeMers was called to the gas station to investigate a discrepancy in the station's fuel inventory numbers. DeMers testified that when a client calls him with such concerns, the first thing he usually does is "calibrate the dispensers to make sure they're putting out what they're supposed to be putting out." DeMers did not find any issues with the software mechanisms inside pump 15 at that time. Next, DeMers will place padlocks on the fill caps and the dispensers, which he did in this case. On March 15, after Rodriguez-Padron's arrest, DeMers was called back to the gas station to repair pump 15, at which time he found clear signs of tampering. DeMers found that the white gear component was missing. In its place, he found a rubber cylinder, smaller in diameter than the missing gear, touching the brass wheel. DeMers concluded that this was the source of the discrepancy in the station's fuel inventory numbers. According to DeMers, because of the rubber cylinder's smaller size, it would significantly slow rotation of the brass wheel and the pump would dispense more fuel than it should. DeMers noted that if someone removed the white gear but did not replace it, the pump would not function. At trial, DeMers identified the white gear found in Rodriguez-Padron's pocket at the time of his arrest as the missing component from pump 15.

DeMers described the outside of pump 15 and how someone might access the pump cabinet to tamper with the pump's internal mechanisms, and he noted other signs of tampering evident on March 15, 2024. DeMers explained that the pump has a bottom door with a lock in the center, as well as a plastic piece covering the internal mechanisms and an additional padlock. DeMers explained that the pump opens from the back side, not the front. On March 15, DeMers found that the plastic piece was "broken" and "separated" from the larger door. Another cover that goes "over all those brass gears" was also missing. He explained that someone could "pry" or "force" the pump cabinet open to access it without a key and that no special tools were needed to remove the white gear and then insert a smaller component. According to DeMers, once someone "had that front piece off," they could reach into the pump cabinet about 3 or 4 inches to remove the white gear without unlocking the padlock. He estimated that it would take 1 minute or less to pry the cabinet open and replace the white gear and that the process could be reversed in the same amount of time. If the white gear was not returned to the cabinet and a smaller component was left in place, the pump would continue to dispense more fuel than paid for, which was what happened on March 15.

DeMers' repairs to pump 15 included replacing the mechanism housing the white gear, creating a metal security box with a padlock to prevent further tampering with the internal mechanism, and replacing the "top main door" assembly where the plastic had been broken. DeMers' estimate for the repairs totaling $7,414.19 was received into evidence. DeMers testified that his estimate was "real close" to the actual charges for his repairs to pump 15.

Sergeant Ryan Rathbun conducted a post-arrest interview with Rodriguez-Padron, who agreed to speak with Rathbun. During the interview, Rodriguez-Padron claimed that he had the white gear in his pocket because he found it on the ground. Rathbun asked Rodriguez-Padron why he had a tank full of diesel fuel in the back of his pickup. Rodriguez-Padron told him that he works as a diesel mechanic and needed the fuel for when people hired him to fix the "gelling" of their own diesel fuel during cold weather. In his testimony, Rathbun described that a fuel theft "scheme" usually involves "somebody who has put them up to it . . . because they don't want to be the one to get caught or arrested," who will then reimburse the person who steals the fuel for the fuel plus

any prepayment. Rathbun noted Rodriguez-Padron mentioned that he was going to want the receipt for his prepayment of diesel fuel on March 15, 2024, returned to him. Rathbun found his request "pertinent to this type of investigation on a prepay."

After the State rested, Rodriguez-Padron testified on his own behalf. With respect to the tank in his pickup bed, he testified that it had a capacity of about 250 gallons and that he always kept about 150 to 180 gallons of diesel fuel in the tank. He indicated that he used the fuel in his work as a self-employed diesel mechanic when called to "clear out the lines" on vehicles with diesel fuel that had gelled in cold weather.

According to Rodriguez-Padron, he always dispensed fuel from pump 15 at the gas station because he had received contaminated fuel from pump 13 or 14 on a prior occasion. He also testified that the store manager had told him to use pump 15. He agreed that despite not wanting to use pump 14, he would regularly pull up to pump 14 when he arrived, only to move his pickup a short time later and then dispense fuel from pump 15. When asked to explain this behavior, Rodriguez-Padron testified that he sometimes forgot he did not want to use pump 14 and moved his pickup when he remembered. Rodriguez-Padron agreed that it generally took him 7 to 8 minutes to dispense fuel into the tank in the bed of his pickup, testifying that he told "the manager once that [pump 15] was working really slow," and stating "that's why I was using both hoses, so the process would be faster."

Rodriguez-Padron was asked about the white gear found in his pocket upon his arrest. He testified that he found the gear on the ground next to the trashcan, and he picked it up because as a mechanic he is "familiar with those types of . . . parts," he "didn't think it belonged to somebody," and "[s]ometimes these parts can serve [mechanics] for other things." Rodriguez-Padron was also asked about what he was doing in surveillance video footage showing him opening the passenger side door of his pickup while parked at pump 14 on days when his girlfriend was not present. According to Rodriguez-Padron, he was removing trash and doing other things to "clean out" his pickup. He was shown surveillance video of him kneeling next to the pump and agreed the video did not show him throwing away trash on that occasion. He testified that he might have been picking up a coin or checking the tires on his pickup.

The jury found Rodriguez-Padron guilty of both counts. The district court accepted the jury's verdict, ordered a presentence investigation report (PSR), and scheduled the case for sentencing.

On November 21, 2024, the district court imposed concurrent sentences of 20 months' imprisonment for theft by unlawful taking and 365 days' imprisonment for criminal mischief. The court granted Rodriguez-Padron 252 days' credit for time served and ordered him to pay $4,419.80 in restitution. Rodriguez-Patron subsequently perfected his appeal to this court.

ASSIGNMENTS OF ERROR

Rodriguez-Padron assigns that (1) hearsay evidence was improperly allowed into evidence, (2) the evidence was insufficient to support his convictions, and (3) the sentences imposed upon him were excessive and constitute an abuse of discretion.

Rodriguez-Padron also assigns that "ASSISTANCE PROVIDED BY TRIAL COUNSEL WAS INEFFECTIVE." This general assignment of ineffective assistance that does not specify counsel's deficiency is insufficient to raise the claim on direct appeal, and we do not address it

further. See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019), *disapproved on other grounds, State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025) (assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and appellate court will not scour remainder of brief in search of such specificity).

STANDARD OF REVIEW

Hearsay is not admissible except as provided by the Nebraska Evidence Rules. *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024). Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds. *Id.*

In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Scott*, 319 Neb. 153, 21 N.W.3d 490 (2025). The relevant question in reviewing a criminal conviction for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

*Admission of Evidence.*

Rodriguez-Padron assigns that hearsay evidence was improperly allowed into evidence, specifically exhibits 3-7. These exhibits were received under the business records exception to the hearsay rule pursuant to Neb. Rev. Stat. §§ 27-803(6)(a) (Cum. Supp. 2024). At trial, Rodriguez-Padron did not object to the admission of the computer-generated cash register journals for the transactions in question; rather, he made hearsay objections to Pavlik's handwritten notations on these exhibits as being outside the business records exception.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat. § 27-801 (Cum. Supp. 2024). See, also, Neb. Rev. Stat. § 27-802 (Reissue 2016). Pavlik's handwritten notations were out-of-court statements, and because of her death, she was not available to testify about those notations at trial. A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

Rodriguez-Padron notes Neb. Rev. Stat. § 27-804 (Reissue 2016), which provides exceptions for admitting out-of-court statements for witnesses unavailable for reasons such as death. Specifically, he notes § 27-804(2)(e), which provides that a statement, not specifically covered by any of the other exceptions identified in § 27-804, will not be excluded by the hearsay rule if the declarant is unavailable as a witness if that statement has equivalent circumstantial

guarantees of trustworthiness and if the court makes certain specified determinations. He notes that to admit an out-of-court statement under this exception, the proponent of the statement must give the adverse party sufficient notice in advance of trial to allow the adverse party a fair opportunity to prepare. Rodiguez-Padron argues that the district court did not make any findings about the admissibility of exhibits 3-7 under § 27-804(2)(e). Such findings were not necessary, however, given that the exhibits were not admitted under § 27-804 but were, instead, admitted as business records under § 27-803(6)(a). Rodriguez-Padron also asserts, inaccurately, that the State informed the court of Pavlik's recent death on the first day of trial and argues that this information was not provided in sufficient time to allow the defense a fair opportunity to prepare. The record shows that Pavlik's death was discussed during the July 31, 2024, hearing on the State's motion to endorse Barnes as a witness. Trial did not start until August 13. Rodriguez-Padron did not argue during the July 31 hearing that he would have inadequate time to prepare for Barnes as a replacement witness.

Exhibits 3-7, the gas station's cash register journals for the transactions at issue, including Pavlik's handwritten notes on those journals documenting her observations upon viewing the corresponding surveillance video footage, were received into evidence as business records of the gas station. Section 27-803(6)(a) provides that the following are not excluded by the hearsay rule even if the declarant is available as a witness:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions . . . made at or near the time of such acts, events, or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or method or circumstances of preparation indicate lack of trustworthiness. The circumstances of the making of such memorandum, report, record, or data compilation, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight.

The party seeking to admit a business record under the business records exception to the hearsay rule bears the burden of establishing foundation under a three-part test. *State v. Walker*, 29 Neb. App. 292, 953 N.W.2d 65 (2020). First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities. *Id.* Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. *Id.* Third, the proponent must authenticate the record by a custodian or other qualified witness. *Id.* Firsthand knowledge of the actual recording is not a foundational step to qualifying the record as a business record, and any lack of firsthand knowledge on the part of the custodian or other witness who lays foundation for the document goes simply to its weight. *Id.*

Rodriguez-Padron did not object to the computer-generated portions of exhibits 3-7, and Barnes' testimony established that the cash register journals were created by the gas station's computer system in the ordinary course of business. Likewise, she testified without objection that the handwriting on exhibits 3-7 was Pavlik's. See Neb. Rev. Stat. § 27-901(2)(b) (Reissue 2016) (concerning authentication of handwriting by nonexpert opinion as to its genuineness, based upon

familiarity not acquired for purposes of litigation). Rodriguez-Padron's hearsay objections at trial and his arguments on appeal focus on the admission of the handwriting under the business records exception.

We agree with the State that Barnes' testimony was sufficient to establish the necessary foundation to admit the handwriting as part of the gas station's business records. Barnes testified that in the event of potential exorbitant losses, the station's managers are trained to review security footage and document details associating transactions on the printouts with the corresponding security footage. Barnes testified that Pavlik was trained in that process and after reviewing exhibits 3-7, Barnes testified that Pavlik had followed that process in making her notations. While not a procedure used every day by the station's managers, Barnes' testimony shows that managers were trained in this procedure and followed it as part of the station's regular business practices when fuel thefts, such as those at issue here, were suspected. Barnes, the current manager of the station and assistant manager at the time of the thefts, was a qualified custodian of the gas station's records, and the fact that she did not make the handwritten notations at issue goes to the weight of that evidence and not its admissibility. The district court did not err in receiving exhibits 3-7 in their entirety.

Rodriguez-Padron argues, "Without the handwritten notes, it is not apparent by viewing the video evidence that [he] was engaging in any illegal activity at the [gas station] on the dates and times alleged by the State." Brief for appellant at 16. We disagree that the handwritten notes are the only evidence necessary to establish such a connection. The notes only state the colors of the vehicle driven, the times the vehicle "pulled up" to the pump, and occasionally, note the clothing colors worn by the person making the prepaid transactions represented in the cash register journals. Again, Rodriguez-Padron did not object to the computer generated journals, which include dates and times of relevant transactions. And far more information is represented in the surveillance video evidence, the admission of which Rodriguez-Padron does not challenge on appeal. He admitted at trial that he was the person depicted in the videos. Even if the district court erred in admitting the handwritten notations on exhibits 3-7, any such error was harmless. The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Scott*, 319 Neb. 153, 21 N.W.3d 490 (2025).

In his brief on appeal, Rodriguez-Padron also notes a portion of Baker's testimony, and he argues that Baker's testimony about certain statements reported by Pavlik to Baker during the investigation were inadmissible hearsay. Rodriguez-Padron did not object to this testimony at trial and waived any error in its admission. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787. This assignment of error fails.

*Sufficiency of Evidence.*

Rodriguez-Padron was convicted of theft by unlawful taking, $1,500 to $5,000 (a Class IV felony), and criminal mischief, $1,500 to $5,000 (a Class I misdemeanor). Rodriguez-Padron assigns that the evidence was insufficient to support his convictions.

Theft by unlawful taking is committed when a person "takes, or exercises control over, movable property of another with the intent to deprive him or her thereof." § 28-511(1). For theft

offenses graded above a Class II misdemeanor, the State must prove beyond a reasonable doubt that the property at issue had a value within the ranges set forth in § 28-518. See § 28-518(9). "Theft constitutes a Class IV felony when the value of the thing involved is one thousand five hundred dollars or more but less than five thousand dollars." § 28-518(2). Criminal mischief is committed when a person damages property of another intentionally or recklessly; intentionally tampers with property of another so as to endanger person or property; or intentionally or maliciously causes another to suffer pecuniary loss by deception or threat. § 28-519. The amount of pecuniary loss is not an element of criminal mischief as defined by § 28-519, but determines the grade of the offense and relates to the punishment which may be imposed. *State v. Flye*, 245 Neb. 495, 513 N.W.2d 526 (1994). Criminal mischief is a Class I misdemeanor if the person "intentionally or maliciously causes pecuniary loss of one thousand five hundred dollars or more but less than five thousand dollars." § 28-519(3).

The evidence shows that the gas station suffered diesel fuel losses between the end of February and mid-March 2024 totaling more than $4,000 and that it paid approximately $7,400 for repairs to pump 15. Rodriguez-Padron does not dispute the value of alleged fuel loss or the value of the repairs to pump 15. On appeal, he primarily challenges the weight and sufficiency of the evidence, arguing that no rational trier of fact could have found he was the person who stole diesel fuel from the gas station and tampered with the internal mechanism of pump 15. We disagree.

At the time of Rodriguez-Padron's arrest, he had been pumping diesel fuel from pump 15 through the windows of his pickup topper into a tank in the bed of the pickup. The 250 gallon tank was nearly full, and a white gear was found in Rodriguez-Padron's pocket. The evidence shows that this gear was identical to a component in the pump mechanism that determines when a prepaid amount of fuel has been dispensed, and when removed and replaced with a smaller object, causes the pump to dispense more than the prepaid amount. The technician who was called to make repairs to pump 15 after Rodriguez-Padron's arrest testified that pump 15 was missing this white gear, which had been replaced by a smaller cylinder that was not supposed to be there.

The technician explained how a person could access the pump cabinet without a key, remove the gear, replace it with a smaller object, and after fueling, reverse the process, all in a short amount of time. The evidence shows that portions of the outside covering of the pump were broken in such a way as to indicate tampering. During a prior inspection due to the fuel losses at the gas station, the technician found that the software inside the pumps was operating properly and dispensing the correct amount of fuel. However, on March 15, 2024, he found the white gear from pump 15 had been replaced by a smaller rubber cylinder. He concluded that this replacement was the source of the gas station's diesel fuel losses.

Video surveillance from the gas station was admitted in evidence, and Rodriguez-Padron agreed at trial that he was the person dispensing diesel fuel in this footage. The surveillance videos show a similar pattern of behavior on the dates depicted with a few minor variations. In general, they depict Rodriguez-Padron pulling into the bay for pump 14, getting out of his pickup, and crouching at the back of pump 15 for a short time before returning to his pickup and moving it into the bay for pump 15. After prepaying for diesel fuel, Rodriguez-Padron returns to his pickup and dispenses fuel from both the main pump and the satellite pump before backing out and returning

to the bay for pump 14, where he again crouches behind pump 15 for a short time before returning to his pickup and leaving the gas station.

Rodriguez-Padron primarily challenges the credibility of various witnesses and the weight of certain evidence, but those are matters for the finder of fact. See *State v. Scott*, 319 Neb. 153, 21 N.W.3d 490 (2025) (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact). When the evidence is viewed in the light most favorable to the State, a rational trier of fact could have found that Rodriguez-Padron was the individual who caused more than $7,000 in damage to pump 15 and took more than $4,000 of diesel fuel from the gas station without paying for it. The evidence was sufficient to sustain Rodriguez-Padron's convictions.

*Excessive Sentence.*

Rodriguez-Padron asserts that the sentences imposed upon him were excessive and constitute an abuse of discretion. He argues that the district court should have imposed sentences of "time served," and notes that he will continue to be incarcerated on federal charges regardless of the sentences imposed in this case. Brief for appellant at 27. The State counters that to the extent Rodriguez-Padron seeks shorter sentences, no relief can be granted as he completed his sentences in this case and was mandatorily discharged on January 12, 2025. The State notes that generally, an appeal of a conviction is moot when a criminal defendant has completely served his or her sentence. See *State v. Roberts*, 304 Neb. 395, 934 N.W.2d 845 (2019). However, an appeal from a criminal conviction is not moot, even though a sentence for a criminal conviction has been fully served, when the defendant is subjected to collateral consequences resulting from the criminal conviction. *State v. Campbell*, 24 Neb. App. 861, 900 N.W.2d 556 (2017). See, also, *State v. Patterson*, 237 Neb. 198, 465 N.W.2d 743 (1991). Here, the PSR indicates that Rodriguez-Padron was born in Cuba and identifies his immigration status as "Documented Alien" and elsewhere indicates that he received "permanent residency status" in the United States in 2014. His felony theft conviction subjects him to various possible state and federal collateral consequences. Accordingly, Rodriguez-Padron's appeal from his conviction is not moot, and we have addressed his assignments of error in that regard above.

Rodriguez-Padron's assignment of error challenging the length of his sentence as excessive, however, rests upon facts that no longer exist. An action becomes moot when the issues initially presented in litigation cease to exist or the litigants lack a legally cognizable interest in the outcome of the litigation. *State v. Roberts, supra*. A moot case is one which seeks to determine a question which does not rest upon existing facts or rights or in which the issues presented are no longer alive. *Id.* The central question in a mootness analysis is whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022). Because Rodriguez-Padron has already served the sentences he is challenging, his claim that those sentences were excessive does not rest upon existing facts, and he lacks a legally cognizable interest in the outcome of the issue.

CONCLUSION

For the reasons stated above, we affirm Rodriguez-Padron's convictions and sentences.

AFFIRMED.